EXHIBIT A

STATE OF INDIANA    )    IN THE ST. JOSEPH CIRCUIT/SUPERIOR COURT
            )SS:
COUNTY OF ST. JOSEPH  )

ROBERT FIRTH         )
FAN ACTION, Inc.       )
BLUE AND GOLD.COM   )
              )
    Plaintiffs,     )
              )
    v.         )    CAUSE NO. 71 D 0 6 100 CT 0 0 0 2 2
              )
YAHOO! Inc. dba: RIVALS.COM )
TIM PRISTER,      )
JACK FREEMAN,    )
PETE SAMPSON,    )
SHANNON TERRY,   )
BOBBY BURTON,    )
              )
    Defendants.   )

*FILED*
FEB 4 - 2010
St. Joseph Superior Court
Clerk

## VERIFIED COMPLAINT AT LAW FOR FRAUD, INTERFERENCE WITH A CONTRACT, CONVERSION, DECEPTIVE BUSINESS PRACTICES, AND CIVIL RACKETERING

Plaintiffs, Robert Firth, Fan Action, Inc., and Blue and Gold.com, by their undersigned

counsel for their cause of action against the above identified Defendants alleges:

## FACTS

1. At all times relevant to this suit Fan Action, Inc., and BLUE AND GOLD.COM, also known as BlueandGoldIllustrated.com, BGI, GoBlueGold.com plus dozens of other domains and trademarks were owned by Mr. Robert Firth at all times relevant to this action.

2. The plaintiff's websites, GoBlueandgold.com, 1st two year contract and 2nd 2 year contract were hosted by Rivals.com between 2001 and 2005.

1

3. There were two 2 year contracts for the service.

4. BlueandGold.com's pay premium websites began in 1996-1997 and Rivals began in 2001.

5. In 2001 at the beginning of the first 2 year contract with Rivals Blueandgold.com had approximately 2700 paid premium members. In 1st 2 year contract BGI allowed to keep 100% of both BGI paid premium sites operational plus received between 55-70% of Rivals hosted GoBlueand Gold.

6. The Rivals.com ND website had approximately 70-200 paid premium members.

7. The BGI owned web domain "Goblueandgold.com" was hosted by Rivals and then stolen.

8. In the 2nd two year contract Blueandgold.com received 57% of gross income from Rivals. Blue and Gold no longer had the right to continue to operate their other paid premium sites, "NDRecruiting.com" "InsideND.com" and "InstantIrish.com".

9. During the first 2 year contract it was discovered that Rivals.com was taking $500.00 per month from money owed to Blueandgold.com and using that money to pay Tim Prister $500.00 per month to write for Rivals.com on their site.

10. This action put Prister in violation of his non-compete contract with Fan Action Inc. Rivals.com was acting in concert with Prister by stealing the money from Fan Action to pay Prister.

11. The second 2 year contract for Rivals.com to host Blueandgold.com began in August 2003.

2

12. By 2004 at the latest, BGI webmaster, Jack Freeman, began switching domain names owned by BGI out of Fan Action's list of names and into other names or entities under his control or Rivals.com's control, ie:"Goblueandgold.com", etc. Rivals later listed many of these as being owned and some copywrited by them including "IrishIllustrated.com" and "GoBlueandGold.com" taken out by Freeman in March 2004 along with "FightingIrishIllustrated.com" while under contract with Fan Action.

13. There were a number of other domain names co-opted by Freeman for use by Rivals.com.

14. In 2003, just after Blue and Gold.com had agreed to its 2nd two year contract to be hosted by Rivals, Prister quit with no notice and attempted to get Lou Somogyi to quit and walk out with him. When he failed to get Somogyi to quit with him Prister returned to work at Blue and Gold a few days later and was rehired as an independent contractor.

15. In May 2005 Jack Freeman quit with no notice, while under contract with BGI, and went to work for Rivals.com effectively leaving BGI with no website or webmaster. Pete Sampson, a writer for BGI, quit with no notice and went to work for Rivals the day after Freeman. Between May and August 2005 Matt Cashore, a longtime freelance photographer for BGI, quit and went to work for Rivals. Steve Hare, a freelance recruiting writer for BGI, also quit and went to work for Rivals. Tim Prister, a 22 year BGI veteran writer and former BGI editor, signed a contract with Rivals while still under contract with BGI before BGI's

3

contract with Rivals expired August 19, 2005

16. Between January 2005 and August 2005 at the latest, Jack Freeman along with
Pete Sampson, Tim Prister and Rival's CEO Shannon Terry and his assistant,
Bobby Burton began the process of misdirecting Fan Action trademarked names
and cherry picking BGI owned web domains to point to Rival's newly named ND
website, "IrishIllustrated.com" so that scores of search engines directed to
"Blueandgold.com", "Blue and Gold Illustrated", "BGI.RIVALS.COM",
"GoBlueandGold.com", etc. would point to Rival's ND site so that they would be
misdirected when the switch was flipped at Midnight on August 19th, 2005. Prister
was passed off as the founder of Blue and Gold. BGI was used virtually
everywhere on search engines pointing to Rivals.com. Since 1983 Blue and Gold
Illustrated has been universally recognized throughout the Notre Dame Nation as
BGI. Trademarked phrases such as "America's Foremost Authority on Fighting
Irish Football", BGI's annual magazine " "Fighting Irish Football Preview" all
were wrapped around Irish Illustrated in such a way to make it appear as if Blue
and Gold Illustrated had become Irish Illustrated.

17. In addition to the five BGI employees that were hired by Rivals known offers
were made to BGI employees; Dave Follett (Director of Merchandise Sales), Lou
Somogyi (20+ year BGI writer and well known throughout the country), Tony
Rice (former ND All American and QB of ND's 1988 National Champions; BGI
employee) and Bob Chmiel (Former Assistant ND Coach and recruiting co-
ordinator under Lou Holtz).

4

18. BGI never received its share of deferred liability cash after the split while still under contract. Based on 4200 premium subscribers deferred liability would have been approximately $250-271K before interest for the past few years.

19. The cost BGI had to pay to hire new employees and build a completely new website to compete with a site that belonged to BGI to begin with ranged between $400K to $500K.

20. The representations were made by defendant with the intent to defraud and deceive plaintiffs and with the intent to induce plaintiff to act in the manner herein alleged. And at the time defendant made the promises to plaintiffs, defendant had no intention of performing them. Once they had a signed contract with Prister their plan to become a "new" BlueandGold.com was in full gear.

21. Plaintiffs, at the time these representations were made by defendant and at the time plaintiffs took the actions herein alleged, was ignorant of the falsity of defendant's representations and believed them to be true. Plaintiffs' were ignorant of defendant's secret intention and plaintiffs could not, in the exercise of reasonable diligence, have discovered defendant's secret intention.

22. Plaintiff's reliance on defendant's representations was justified because of the written agreement.

23. As a proximate result of defendant's fraud and deceit and the facts herein alleged, plaintiffs have been damaged in the sum of $25,000,000.00.

24. In doing the acts herein alleged, defendant acted with oppression, fraud, and malice, and plaintiff is entitled to punitive damages in the sum of $75,000,000.00.

5

WHEREFORE, Plaintiffs by their counsel, Doug A. Bernacchi, pray for judgment against defendant as follows:

1. For general damages in the sum of $25,000,000.00;

2. For punitive damages in the sum of $10,000,000.00;

3. For costs of suit incurred herein; and

4. For such other and further relief as the court may deem proper.

By:

Doug Allen Bernacchi, MBA/JD
Attorney for the Plaintiffs
215 West Eighth Street
P.O. Box 289
Michigan City, IN 46361-0289
Attorney Number 15472-46
(219) 879-2889

## COUNT I- MISAPPROPRIATION OF A TRADE SECRET AS TO ALL DEFENDANTS

25. Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 24.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

A. Defendants, their officers, agents, servants, employees, licensees, attorney,

related companies and all other persons acting for, with, by, through or under them, and each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

        B.     The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

        C.     The Court trebles the damages awarded to the Plaintiffs;

        D.     The Court award Plaintiffs its attorney fees and costs incurred in this action: and

        E.     The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

## COUNT II – UNFAIR COMPETITION
## AS TO ALL DEFENDANTS

26.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 25.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

        A.     Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law

7

trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

      B.    The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

      C.    The Court trebles the damages awarded to the Plaintiffs;

      D.    The Court award Plaintiffs its attorney fees and costs incurred in this action: and

      E.    Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

### COUNT III - BREACH OF CONTRACT

27.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 26.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

      A.    Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law

trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

      B.    The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

      C.    The Court trebles the damages awarded to the Plaintiffs;

      D.    The Court award Plaintiffs its attorney fees and costs incurred in this action: and

      E.    The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted technology belong to Mr. Robert Firth and Fan Action, Inc.

## COUNT IV – UNJUST ENRICHMENT
## AS TO ALL DEFENDANTS

28.    Plaintiffs re-allege incorporate herein by reference the allegations contained in paragraphs 1 through 27.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

      A.    Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

9

B.    The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

C.    The Court trebles the damages awarded to the Plaintiffs;

D.    The Court award Plaintiffs its attorney fees and costs incurred in this action: and

E.    The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

## COUNT V– CONVERSION

29.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 28.

30.    During TIM PRISTER, JACK FREEMAN, PETE SAMPSON, where employed by Mr. Robert Firth, and SHANNON TERRY, and BOBBY BURTON where under contract to Mr. Robert Firth, without authorization from Mr. Robert Firth, knowingly and intentionally exerted unauthorized control over the plaintiffs proprietary intellectual property and the technology Mr. Firth developed and their conduct was undertaken in violation of Indiana Code § 35-43-4-2.

31.    Thereafter TIM PRISTER, JACK FREEMAN, PETE SAMPSON, SHANNON TERRY, and BOBBY BURTON's, wrongful misappropriated Plaintiffs proprietary, unique, intellectual property and technology

10

developed and associated with Robert Firth's and Fan Action, Inc., websites.

32.    At the time of their conversion Plaintiffs' business had a value in excess of $6 million.

33.    TIM PRISTER, JACK FREEMAN,  PETE SAMPSON, SHANNON TERRY, and BOBBY BURTON  knowingly and intentionally converted or withheld the Plaintiffs intellectual property for their own use in defiance of the Plaintiffs rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

A.    Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged  to Mr. Robert Firth and Fan Action, Inc.

B.    The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

C.    The Court trebles the damages awarded to the Plaintiffs;

D.    The Court award Plaintiffs its attorney fees and costs incurred in this action: and

11

E.    The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted technology belong to Mr. Robert Firth and Fan Action, Inc.

## COUNT VI- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AS TO ALL DEFENDANTS

34.    Plaintiffs re-allege and  incorporate herein by reference the allegations contained in paragraphs 1 through 33.

35.    The conduct of the defendants, their managers, and defendants other employees as alleged herein above constitutes extreme and outrageous conduct, which was intended to cause severe emotional distress to the Plaintiff.

36.    The conduct of the defendants, their managers, and defendants other employees alleged above were committed while they were acting as agents for defendants and in the scope of and during the course of their employment.

37.    The defendants acted with a) knowledge that severe emotional distress to plaintiff Robert Firth  was substantially certain to result and b) with reckless indifference to the likelihood that severe emotional distress to plaintiff Robert Firth would result from its actions.

12

38. Defendants had sufficient knowledge of the material facts and circumstances regarding the actions of the defendants.

39. The conduct on behalf of the Defendants' as alleged above did in fact cause severe emotional distress to the Plaintiff Robert Firth. Plaintiff Robert Firth has suffered lasting emotional harm and trauma, bills, expenses, attorney fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment for the following relief:

A. Compensatory damages for, pain and suffering and loss of enjoyment of life, for present and future expenses reasonably necessary for the plaintiff's treatment for psychological manifestation of mental anguish;

B. Costs and attorney fees;

C. Bad faith and punitive damages to the extent allowed; and

D. Such other and further relief as may be deemed appropriate.

## COUNT VII- DISCLOSURE OF TRADE SECRETS

40. Plaintiff re-alleges incorporates herein by reference the allegations contained in paragraphs 1 through 39.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

A. Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of

13

them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

      B.    The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

      C.    The Court trebles the damages awarded to the Plaintiffs;

      D.    The Court award Plaintiffs its attorney fees and costs incurred in this action: and

      E.    The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted technology belong to Mr. Robert Firth and Fan Action, Inc.

## COUNT VIII - MALICIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT AS TO DEFENDANTS PRISTER AND FREEMAN

      41.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 40.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

      A.    Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of

14

them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

        B.      The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

        C.      The Court trebles the damages awarded to the Plaintiffs;

        D.      The Court award Plaintiffs its attorney fees and costs incurred in this action: and

        E.      The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted technology belong to Mr. Robert Firth and Fan Action, Inc.

## COUNT VIIII - WRONGFUL APPROPRIATION OF CUSTOMER LIST AS TO ALL DEFENDANTS

        42.      Plaintiff re-alleges incorporates herein by reference the allegations contained in paragraphs 1 through 41.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by their attorney, Doug A. Bernacchi, prays that:

        A.      Defendants, their officers, agents, servants, employees, licensees, attorney, related companies and all other persons acting for, with, by, through or under them, and each of

15

them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted trademarks, web domain and common law trademarks and copyrights that belonged to Mr. Robert Firth and Fan Action, Inc.

           B.     The Court orders the Defendants to pay to Plaintiffs $20 million for all damages suffered by the Plaintiffs and all profits gained by the Defendants by reason of the infringing acts complained of herein, together with pre-judgment and post-judgment interest;

           C.     The Court trebles the damages awarded to the Plaintiffs;

           D.     The Court award Plaintiffs its attorney fees and costs incurred in this action: and

           E.     The Court award Plaintiffs such other and further relief as the Court deems just and proper under the circumstances each of them, be enjoined and restrained preliminarily during the pendency of this action and permanently thereafter, from using the copyrighted technology belong to Mr. Robert Firth and Fan Action, Inc.

## COUNT X- FEDERAL R.I.C.O.
### AS TO ALL DEFENDANTS

Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42. This is a complex civil action for RICO remedies authorized by the federal statutes at 18 U.S.C. 1961 *et seq.*; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this honorable Superior Court deems just and proper under all circumstances which have occasioned this COMPLAINT AT LAW See 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO").

The primary cause of this action is a criminal *enterprise* engaged in a *pattern of*

16

*racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past calendar year.

The predicate acts alleged here cluster around use of United States electronic wire systems (internet, telephone, and emails) to breach a contract, engage in copyright infringement, misappropriation of a trade secret, tortuous interference with a contract, unjust enrichment, unfair competition, negligent misrepresentation, actual and constructive fraud. Other RICO predicate acts, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.* wire fraud. See 18 U.S.C. §§ 1341 and 1344, respectively.

The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Plaintiffs with the intent of stealing, usurping, impairing, obstructing, preventing and discouraging Plaintiffs from utilizing the technologies they developed for their profit.

This honorable Superior Court has original jurisdiction pursuant to the civil RICO remedies at 18 U.S.C. 1964, and the holdings of the U.S. Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455 Acquisition and Maintenance of an Interest in and Control of an *Enterprise* Engaged in a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(b).

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein. Substance prevails over form. At various times and places partially enumerated in Plaintiffs *complaint,* all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect,

17

interstate commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b). From 2003 *A.D.*, and ongoing, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities). Plaintiffs further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Conduct and Participation in a RICO *Enterprise* through a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(c). Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

At various times and places partially enumerated in Plaintiffs complaint, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate commerce.

Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

From 2003, *A.D.*, and ongoing, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c)

18

(Prohibited activities).

Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Conspiracy to Engage in a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(d).

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form. At various times and places partially enumerated in Plaintiffs complaint, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

At various times and places partially enumerated in Plaintiffs complaint, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d). *See* also 18 U.S.C. §§ 1961(4), (5) and (9).

From 2003, and is ongoing, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

### PRAYER FOR RELIEF

*Wherefore* , pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiffs requests

19

judgment against all named Defendants as follows:

1. That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2. That all Defendants and all their employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO *enterprise* of *persons*, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3. That all Defendants and all of their employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in the Complaint at Law.

4. That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5. That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6. That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C.

1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

7. That all Defendants pay to Plaintiffs all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8. That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees.

9. That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiffs, Mr. Robert Firth's heirs and assignees.

10. That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands trial by jury of this action.

By:

Doug Allen Bernacchi, MBA/JD
Attorney for the Plaintiffs
215 West Eighth Street
P.O. Box 289
Michigan City, IN 46361-0289
Attorney Number 15472-46
(219) 879-2889

21

## VERIFICATION

I, Robert Firth, was the principle owner of FAN ACTION, Inc., and BLUE AND GOLD.COM in the above-entitled action. I have read the foregoing and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct.

Robert Firth

22

**Robert Firth**

**From:** "Tim Prister" <tprister@blueandgold.com>
**To:** <bfirth@blueandgold.com>
**Sent:** Tuesday, June 28, 2005 11:24 AM
**Subject:** contract offer

June 28, 2005

Bob,

After consulting with my attorney and financial advisor, I have decided to
reject the offer you made last week.

As an independent contractor, my offer to continue writing for Blue &
Gold Illustrated still stands. I will write four stories per issue, including
Extra Point and Timeout, for $3,500 per month, beginning July 1, 2005.
Additionally, as an independent contractor, I will be free to write for
media outlets of my choice.

I really want to continue our relationship, Bob, and believe that both of
us benefit by an affiliation with one another. If, however, you do not
choose to purchase my services for Blue & Gold Illustrated, I am
prepared to wait out the length of the current non-compete, which
expires on June 30, 2006.

Thank you for your consideration of these terms. I hope to continue my
relationship with your publication.

Tim Prister

6/28/2005

## Bob Firth

| | |
|---|---|
| **From:** | Michelle Hamilton [michelle@blueandgold.com] |
| **Sent:** | Wednesday, March 01, 2006 1:48 PM |
| **To:** | 'Trybula, Peter G.' |
| **Cc:** | 'Robert Firth' |
| **Subject:** | Rivals problem |

**Importance:** High

Peter,

It has come to our attention that our name is being used in conjunction with the rivals domain to direct users to the rivals website. The address is bgi.rivals.com. Bob would like a letter drafted asking them to cease and desist. Is this something that you can get on ASAP? The email is below.

Also, did the website irishblueandgold.com ever respond to the letter that was sent?

Let me know if you have any questions,

Michelle

Michelle DeLee Hamilton
Director of Operations
Fan Action, Inc.
1605 N. Home Street
Mishawaka, IN 46545
(574)255-9800
michelle@blueandgold.com


-----Original Message-----
**From:** Patrick Crumb [mailto:pcrumb@scout.com]
**Sent:** Tuesday, February 28, 2006 2:04 AM
**To:** JCFirth@qdl.com
**Subject:** Blue and Gold
John:

Hope all is well with you and Bob.

I wanted to give you a heads up on a couple of things I noticed, just in case you and Bob were not aware.

Were you aware that if you type in "bgi.rivals.com" (your old Rivals network subdomain) it gets redirected to Rivals ND site? They did the same thing to some other publishers who moved to our network. In those instances, I sent a little C&D regarding the use of the publishers trademark in a redirect to their competing site and they complied by removing it. Out of curiousity, I tried something else that we have had to whack Rivals on in the past. If you go on google and type in "blue and gold illustrated", the top seach result is your site, but the second listing is the Rivals ND site. Again, this has happened to us previously - they inbed the former publisher brand/trademark in the search/site registration for their competing site such that users searching for the brand by name get a search result that includes the listing for their site.
   Just thought I would point those two things out.

As an aside, the new Blue & Gold site looks great. You guys were right about Charlie W. Tyrone is settled in at UW and, well, the jury remains out until he is given a fair chance to recruit his own guys. Thank God we have a decent basketball team.

Hope Quality's move to private company status is all you hoped it would be.    We of course are now part of a large public company, with some attendant changes to how we operate. Funny how things work out.

Regards,

Patrick

Patrick Crumb
Scout Media, Inc.
2003 Western Avenue, Suite 700
Seattle WA  98121
(206) 448-8906
pcrumb@scout.com

IrishIllustrated.com - Welcome to IrishIllustrated.com                    Page 1 of 2

**ndirish1996** Rivals Radio: lines open at (866)9-Rivals



HOME · HEADLINES · MESSAGE BOARDS    FOOTBALL · BASKETBALL    RECRUITING

Roster Stats Schedule Scoreboard Standings Leaders Rankings

August 19, 2005
# Welcome to IrishIllustrated.com

**Pete Sampson & Jack Freeman**
IrishIllustrated.com Staff

EMAIL STORY   PRINT STORY

YOUR CC

The Four H

Message B

Welcome to IrishIllustrated.com.

When you logged on to the Rivals.com network today you probably noticed something a little different about your favorite Notre Dame news website. After a four-year partnership with Blue & Gold Illustrated, Rivals.com has decided to hire three of the magazine's staffers to cover the Notre Dame football program, basketball program and recruiting exclusively for you, the web subscriber. IrishIllustrated.com is here to do one thing and one thing only – deliver as the best Notre Dame news source on the Internet. And with the Rivals.com subscription that you already have, you get it all.



**The new II era begins today**

Whether it's giving you breaking news from practice, comprehensive video coverage of Irish workouts, highlights of Notre Dame's top recruiting targets or a great place to discuss the Irish with other educated and enthusiastic ND fans in the Four Horsemen Lounge, we're here to give Irish fans what they want, the complete Notre Dame story.

If you've been reading the site the past few weeks, you've already gotten a taste of what IrishIllustrated.com will be bringing you. Editor Pete Sampson has been on top of Notre Dame fall camp with multiple practice reports each day. Webmaster Jack Freeman has been there too with video highlights of Notre Dame's practices and video interview with Charlie Weis and the players. Finally, Pete and Steve Hare have been covering Notre Dame's recruiting efforts like no one else, breaking news on the commitments of Demetrius Jones and Raeshon McNeil all in the past week.

In the coming weeks and month IrishIllustrated.com will expand its staff to include Jeff Jeffers, the dean of Fighting Irish sports, sports anchor and WNDU and host of the Notre Dame coach's show with Charlie Weis.

Come this spring, we'll be adding another writer that we believe you'll think is second-to-none when it comes to telling the story of Notre Dame's football program.

As you can tell, we're committed to bringing you the best Notre Dame source for football, basketball and recruiting news. Rivals.com is already the industry leader in online college sports and in conjunction with the IrishIllustrated.com staff we'll

continue to be the largest Notre Dame site on the Internet.

We may have changed our name, but our commitment to bringing you the best in Notre Dame news remains the same.

Go Irish!



**Rivals.com: About Us | Advertise with Us | FAQ/Help | Contact Us**
Site-specific editorial/photos Copyright 2002-2005 IrishIllustrated.com. All rights reserved. This website is an unofficial and independent source of news and information not affiliated with any school or team.
**Privacy Policy | Terms of Service | Copyright Infringement**

August 17, 2005

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**
**AND FIRST CLASS MAIL**

Tim Prister
[need address]

                    Re:     **Fan Action, Inc.**

Dear Mr. Prister:

This law firm represents Fan Action, Inc. We understand your relationship as an independent
contractor with Fan Action has recently terminated and understand that you have told Fan Action
that you have signed a "contract" with Rivals.com. We are writing to remind you of your
continuing legal obligations under the Independent Contractor Agreement between you and Fan
Action dated August 30, 2004 (the "Agreement"), a copy of which is enclosed for your
reference.

In the Agreement, you agreed to be bound by certain covenants for a period of 15 months
following the termination of your relationship with Fan Action. Specifically, you agreed, among
other things, not to

           own an interest in, operate, join, control or participate in, or be
           connected as an officer, employee, agent, independent contractor,
           partner, shareholder, or principal of or in any corporation,
           partnership, proprietorship, firm association, or other entity,
           developing, soliciting orders for, selling, distributing, or otherwise
           marketing products, goods and/or services which directly, or
           indirectly, compete with the Corporation's Business.    The
           Contractor acknowledges that, in view of the scope of the
           Corporation's Business, the area in which the Contractor shall be
           precluded from competing is both reasonable and reasonably
           required for the protection of the Corporation.

Section 2B(i). Additionally, you agreed not to "divert or take away, or attempt to divert or take
away . . . any of the customers of the Corporation." *Id.* at 2B(iv).

> Formatted: Font: 8 pt
> Deleted: BDDB01 4150034v1

BDDB01 4150188v1.

Ahmet Mehmedov                     -2-                        August 17, 2005

By your own admission, you are currently employed by Rivals.com, a direct competitor of Fan Action. Moreover, Fan Action recently learned that you have been writing, without our knowledge, for various Indiana newspapers about the University of Notre Dame. Additionally, we know that as of August 15, 2005 you were extensively questioning Coach Weis of the University of Notre Dame after evening practice. Such conduct by you plainly violates your contractual obligations under the Agreement.

Fan Action demands that you immediately cease and desist from further violations of your Agreement. Fan Action further demands that you comply fully with all of your continuing legal obligations under the Agreement. In particular, your employment with Rivals.com violates the Agreement.

Please advise me immediately in writing whether you intend to comply with the foregoing demand and discontinue any further activities in breach of the Agreement. If you fail to provide a satisfactory written response by close of business on August 19, 2005, we will presume that you are continuing to engage in activities in violation of the Agreement. Please be advised that unless your conduct in violation of the Agreement ceases immediately, Fan Action stands ready to pursue all available equitable and legal remedies against you to protect its contractual and other legal rights.

By copy of this letter to Shannon Terry at Rivals.com, we are placing Rivals.com on notice of your obligations under the Agreement and Fan Action's demand that you cease and desist any activities in violation of the Agreement. Fan Action also demands that Rivals.com not induce, or assist in, any breaches of your obligations under the Agreement.

This letter is without prejudice, and Fan Action reserves all of its rights and remedies under the Agreement and all applicable laws. We expect that you and Rivals.com will understand the seriousness of this matter and will comply immediately and fully with the foregoing demands.

Very truly yours,

BAKER & DANIELS LLP


David R. Pruitt

Enclosure

c      Shannon Terry (w/enclosure, via Certified Mail, RRR)
       7101 Executive Center Drive, Suite 100
       Brentwood, TN 37027

| Deleted: 4150034_1.DOC |
| Deleted: 4147710_1.DOC |
| Deleted: BDDB01 4150034v1 |
| Formatted: Font: 8 pt |

cease and desist letter to Prister (2)
BDDB01 4150189v1



*Final With Shannon Terry's Signature*

## NETWORK AFFILIATE AGREEMENT

This NETWORK AFFILIATE AGREEMENT (the "Agreement") is made as of Aug ("Effective Date") by and between Blue and Gold Illustrated ("Publisher"), and JBC _____ , DBA Rivals.com, a Delaware corporation ("Rivals").

### RECITALS

A.  Rivals has a network of Internet Web sites relating to sports and related topics and activities (the "Network"); and

B.  Rivals and Publisher wish to provide certain services to each other relating to a specific Site or Sites, defined below, in the Network, upon the terms and subject to the conditions set forth below.

THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereby agree as follows:

1.  Definition of Site. For the purposes of this Agreement, the defined term "Site" shall mean the following and the following only: notredame.rivals.com, goblueandgold.com and blueandgold.com.

2.  Web Site Development. Rivals shall incorporate the Site into the Network. Rivals may place the Site at, or move it to, any location on the Network in its sole discretion. Rivals will provide and be responsible for all structural, template layout and technological matters relating to the Site. Rivals will use best efforts to work with Publisher to layout and design the Site.

3.  License Grants. Subject only to the terms and conditions of this Agreement, Publisher hereby grants to Rivals the following exclusive licenses during the term of this agreement: (a) a worldwide license (with a right to sublicense) to use, reproduce, cache, distribute, display and transmit all materials, data and similar information (either (I) used, owned, licensed or otherwise rightfully possessed by Publisher and related to the purposes of this Agreement, or (ii) provided to Rivals in connection with this Agreement (collectively, "Content") including any updates, improvements or modifications made to, or derivative works created from the Content during the term of the Agreement, and to permit third parties to download such Content for their personal use; (b) a worldwide, fully-paid license (with a right to sublicense) to modify and create all "derivative works" and "compilations," within the meaning of such terms as defined in the U.S. Copyright Act ("Derivative Works") from the Content, and to use reproduce, cache, distribute, display and transmit such Derivative Works") from the Content, and to use reproduce, cache, distribute, display and transmit such Derivative Works and to permit third parties to download such Derivative Works for personal use; and (c) a worldwide, fully-paid license (with a right to sublicense) to use, reproduce and display all trademarks, service marks, logos and other distinctive brand features of Publisher (the "Trademarks") that are used in or relate to the Content in connection with this Agreement.

4.  Publisher's Obligations. Publisher's obligations are set forth on Exhibit A attached hereto.

5.  Rivals' Obligations. Rivals' obligations are set forth on Exhibit B attached hereto.

6.  Publisher's Compensation. Rivals shall compensate Publisher as provided on Exhibit C.

*ST*

7.    Electronic Commerce. Rivals will provide electronic commerce tools to publisher as provided on Exhibit D.

8.    Term and Terminations

8.1 Term. Unless earlier terminated as set forth below, this Agreement shall remain effective for an initial period of two (2) years from the Effective Date (the "Term") and shall be automatically renewed and the Term shall be extended for additional one (1) year periods unless, at a time no later than ninety (90) days prior to the end of the then-effective Term, either party gives written notice of its intent not to renew the Agreement to the other party. Notwithstanding the foregoing, Publisher may renew this Agreement for up to five (5) additional years, if Publisher gives notice of such renewal no later than six (6) months prior to the end of the original Term.

8.2 Termination for Cause. This Agreement may be terminated at any time by a party, effective immediately upon notice, if the other party: (a) becomes insolvent, (b) files a petition in bankruptcy, (c) makes an assignment for the benefit of its creditors, (d) breaches any of its material responsibilities or obligations under the Agreement, or (e) by Rivals if Rivals receives notice that Publisher is posting Content without proper license or authorization, provided that a breach under (a) – (d) above may be remedied within fifteen (15) days from receipt of written notice of such breach.

8.3 Effect of Termination. Upon termination or expiration of this Agreement, (a) Rivals' and Publisher's rights under this Agreement shall terminate, (b) each party shall return all Confidential Information, defined below, received or obtained from the other party, and (c) the provisions of Sections 9 hereof, and paragraphs 2, 3, 4, 5, and 6 of Section 18, as well as any payment obligations due and/or accrued, shall survive.

9.    Confidentiality

9.1 Confidential Information. Publisher and Rivals acknowledge that each may receive confidential and proprietary information that is the property of the other party ("Confidential Information") Such Confidential Information shall be subject to the terms of this Agreement, specifically including without limitation the provisions of paragraph 9.2 immediately following, only if the delivery of the Confidential Information is accompanied by and attached to a separate letter from the delivering party containing the legend, " Transmittal of Confidential, Information" and then shall only apply to the information identified in said letter as "Confidential Information" excepting the Confidential Information identified in paragraph 9.3 below.

9.2 Confidentiality Obligations. All Confidential Information will be treated as confidential and proprietary by the receiving party and shall not be disclosed by the receiving party to any third party unless required by law The receiving party will only disclose the Confidential Information of the disclosing party to those of its employees, attorneys, accountants, lenders, consultants and others,who, in each case, are parties to appropriate confidentiality agreements sufficient to comply with the obligations imposed by this Agreement. The provisions of this Section 9.2 will remain binding and in full force and effect, notwithstanding the expiration or termination of this Agreement at any time.

9.3 Original Confidential Information: The parties agree that the following information shall constitute Confidential Information subject to the terms of this Agreement, without compliance with the provisions of paragraph 9.1 above:

9.3.1   This Agreement, its terms, and all Exhibits to this Agreement;

9.3.2   All correspondence and documents exchanged as a part of the discussions and negotiations of this Agreement and any amendment of the Agreement; and

9.3.3   All compensation paid to Publisher and all materials delivered to Publisher setting out or otherwise describing or defining the manner in which such compensation was determined.

9.3.4   Subject to the Ownership sections of this agreement, Publisher's proprietary lists, not relating to user registration on the Site for subscriptions or message boards.

10.   Exclusivity and Non-Compete. Publisher shall not, during the term of this Agreement, without the prior written consent of Rivals, provide any information, articles, stories, conduct any research, or perform other services for individuals, businesses, or proposed businesses on the Internet relating to college athletics ("Competitor"). (Excluding ecommerce, shipped goods stores and mail order merchandising.) Notwithstanding the foregoing, Publisher and its Agents shall be allowed to respond to media questions regarding college athletics to be used solely in non-Internet or non-online media. In the event that Rivals shall consent to Publisher or its Agents supplying any information for use online or on the Internet, Publisher or its Agents shall provide such information to a third party only if such third party agrees to include, along with such information, a direct link to the Site or the Network (at Rivals' discretion). Publisher agrees that during the term of this Agreement, Publisher will not, without prior written approval from Rivals, sign a contract, announce the signing of a contract, or otherwise enter into any agreement to provide services for a Competitor.

11.   Advertising. Publisher may purchase and place advertisements, beyond the scope of any advertisements provided for herein, in print, radio, television or other media for the purpose of promoting the Site and Network at its own cost and expense only if Publisher receives Rivals' prior written consent and approval. Nothing herein shall prevent Publisher from purchasing any such advertisements that do not refer in any way to Rivals or the Network, provided any such advertisement will use the phrase and logo, provided by Rivals, "powered by Rivals.com", and provided that such advertisements are intended to increase public awareness of the Site and drive traffic to the Site.

12.   Representation and Warranties. Each party represents and warrants that it has the full corporate or other right and authority to enter into this Agreement and to perform the acts required of it hereunder, and the execution of this Agreement by such party, and the performance by such party of its obligations and duties hereunder do not and will not violate or contravene any applicable law or regulation or any agreement to which such party is a party or by which it is otherwise bound, or any rights of any third party, and when such party in accordance with its terms. Each party (the "Indemnifying Party") shall indemnify, defend (or at its option, settle) and hold the other party (the "Indemnified Party") (and its officers, directors, employees, and agents) harmless from and against any judgment, losses, deficiencies, damages, fines, liabilities, costs and expenses (including, without limitation, reasonable attorney's fees), incurred or suffered by the Indemnifying Party arising from any claim, suit, action or proceeding which alleges that this Agreement or performance under this Agreement violates any other agreement to which the Indemnifying Party is a party. Publisher represents and warrants that (a) it has, or will have prior to use, full title and interest to the intellectual property licensed to Rivals hereunder, including but not limited to, all written and photographic Content, Trademarks, Service Marks, logos and other distinctive brand features, (b) no third party has any rights in such property and (c) it has full power and authority to license such property to Rivals.

13.   Disclaimer of Additional Warranties. To the maximum extent permitted by applicable law, except as otherwise expressly provided in this Agreement, neither party makes any warranty with respect to any technology, goods, services, rights, or other subject matter

of this Agreement and hereby disclaims all warranties, conditions or representations of any kind, express or implied, including, but not limited to, implied warranties of performance, merchantability, satisfactory quality or fitness for a particular purpose.

14.     Indemnifications.

14.1 By Publisher. Publisher shall indemnify, defend (or at its option, settle) and hold Rivals (and its officers, directors, employees, and agents) harmless from and against any judgment, losses, deficiencies, damages, fines, liabilities, costs and expenses (including, without limitation, reasonable attorney's fees), incurred or suffered by Rivals arising from any claim, suit, action or proceeding (a "Claim") arising from any breach of the terms of this Agreement to the extent the basis of such Claim relates to an allegation that the information supplied by Publisher (except for any Derivative Works or Rivals additions contained therein) contains any material or information that is obscene, defamatory, violates any law or regulation, or breaches the rights of any person or entity, including without limitation, rights of publicity, privacy or personality, and intellectual property rights ("Intellectual Property Rights"), or any Claim arising from a contest, game or sweepstakes on the Site which does not comply with Rivals' game/sweepstakes rules, provided that Rivals provides Publisher with (a) prompt written notice of such Claim; (b) sole control and authority over the defense and/or settlement of such Claim (provided the Publisher will not enter into any settlement that adversely affects Rivals' rights without Rivals' prior written consent) and (c) reasonable assistance in the defense or settlement thereof.

14.2 By Rivals. Rivals shall at its expense, indemnify, defend (or at its option, settle) and hold Publisher (and its officers, directors, employees, and agents) harmless from and against any judgment, losses, deficiencies, damages, fines, liabilities, costs and expenses (including without limitation, reasonable attorneys' fees), incurred or suffered by Publisher arising from any Claim to the extent the basis of such Claim relates to an allegation that any Derivative Works or the use of the Site in accordance with the terms herein infringes the Intellectual Property Rights of a third party through no fault of the Publisher, provided that Publisher provides Rivals with (a) prompt written notice of such Claim; (b) sole control and authority over the defense and/or settlement of such Claim (provided that Rivals will not enter into any settlement that adversely affects Publishers' rights without Publishers' prior written consent) and (c) reasonable assistance in the defense or settlement thereof.

15.     Limitation of Liability. Except in the case of a breach by either party of Section 9, as to Confidential Information, or of Section 10, as to Exclusivity and Non-Compete, in no event will either party have any liability to the other party or any third party for any lost opportunity or profits, costs of procurement of substitute goods or services, or any indirect, incidental, consequential, special or exemplary damages arising out of this Agreement, under any cause of action or theory of liability (including negligence or tort), and whether or not such party to this Agreement has been advised of the essential purpose of any limited remedy

16.     Ownership. The parties acknowledge and agree that as between Rivals and Publisher, (a) Rivals owns all right, title and interest in the Network and all trade secrets, patents, copyrights, trademarks, know-how and moral rights or any similar rights therein or related thereto, (b) except as expressly set forth herein, Rivals owns all right, title and interest in any advertising and promotional revenues relating to the Site and Rivals owns all right, title and interest in any advertising and promotional revenues relating to the Network, (c) Publisher owns all right, title and interest in the Content produced by Publisher on the Site, (d) Publisher and Rivals co-own all information relating to the identity of third parties who visit, register on or subscribe to the Site, including names, addresses, email addresses, etc. (specifically excluding the lists specified in 9.3.4), provided that Rivals' use of this information shall be limited to (i) Rivals' internal marketing of premium subscriptions and (ii) Rivals marketing of its games (Fantasy, Pick'Em, etc.), and (e)

ST

Rivals shall own all Derivative Works created by or for Rivals from the Content in accordance with this Agreement through the term of the contract.

17.    Network Guidelines. Publisher acknowledges and agrees that in connection with the preparation of the Content, it will not publish any materials which defamatory, an invasion of privacy, or a breach of confidential relationship, and will not copy or permit the copying onto the site of articles or photographs created by another unless written permission from the creator of such work has been obtained. Publisher will adhere to Rivals' journalism reasonable guidelines as they are published from time to time.

18.    Miscellaneous.

18.1    Public Announcements. Notwithstanding the provisions of Section 9 of the Agreement regarding confidentiality, the parties may cooperate to create mutually agreeable public announcements of the relationship set forth herein. Publisher will not make any separate public announcement without first obtaining Rivals' prior consent, which will not be unreasonably withheld or delayed.

18.2    Amendment. This Agreement may be amended only by written agreement signed by all of the parties hereto.

18.3    Assignment. This agreement may not be assigned by either party without the prior written consent of the other party provided such consent shall not be unreasonably withheld or delayed. Notwithstanding the preceding sentence, either party may assign this Agreement without prior approval in the event of a merger, acquisition or sale of substantially all assets. Publisher may not assign this Agreement to TheInsiders.com or any entity owned by TheInsiders.com.

18.4    Controlling Law. This Agreement will be interpreted pursuant to the laws of the State of Tennessee without reference to its conflict of laws of principles.

18.5    Notice. All notices and other communications contemplated hereby must be in writing (specifically including, but not limited to, notice of termination, but excluding electronically transmitted databases or other data which may be too voluminous for transfer in writing) and (a) personally delivered; (b) deposited in the United States mail, first-class, registered or certified mail, return receipt requested, with postage prepaid; (c) sent by overnight courier service (for next business day delivery), shipping prepaid or (d) (except for notices of termination by Publisher) sent by facsimile with confirmation of receipt of facsimile to the number indicated. Except as otherwise specified herein, notices will be deemed given and received when received. Notice shall be effective only if delivered to the parties at the following addresses:

Publisher:        (address on signature page)

Rivals:           Rivals com
                  Attn: Shannon Terry
                  7101 Executive Center Drive, Suite 100
                  Brentwood, TN 37027

Any change to the above addresses shall not be effective unless notice has been given by certified mail, return receipt requested, or facsimile with confirmation.

18.6    Binding Effect; Authority This Agreement will be binding upon and will inure to the benefit of the legal representatives, successors and duly authorized assigns of each party whether resulting from merger, acquisition, reorganization or assignment pursuant to the terms hereof.

18.7    Entire Agreement. This Agreement shall constitute the entire, sole and exclusive agreement between Rivals and Publisher with respect to the subject matter set forth and shall supersede any and all other agreements, oral or written. Each party hereto acknowledges that it has not relied upon any representation or promise not expressly set forth herein.

18.8    Severability; Waiver. If any provision of this Agreement is found invalid or unenforceable, that provision shall be enforced to the maximum extent permissible, and the other provisions of this Agreement will remain in full force and effect. The waiver by either party of a breach of or a default under any provision of this Agreement, shall not be construed as a waiver of any subsequent breach of the same or any other provision of this Agreement, nor shall delay or omission on the part of either party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a waiver of any right or remedy.

18.9    Independent Contractor. Publisher is an independent contractor who is in business for itself. This Agreement shall not create the relationship of employer and employee, a partnership, or a joint venture. Rivals shall not control or direct the details and means by which Publisher performs its work, nor will Rivals provide Publisher with an office. Publisher shall determine the number of days and hours of its work as well as the number of its assistants, partners or employees. Publisher shall be solely liable for the wages, fringe benefits, payroll taxes, work schedules and work conditions of its partners or employees. Each party is responsible for paying all costs of conducting its business, including but not limited to, the expense and responsibility for any applicable insurance or city, county, state or federal licenses, permits, taxes or assessments of any kind. Each party shall be responsible for payment of any self-employment taxes including, but not limited to, income taxes, Social Security taxes, and worker's compensation premiums. Each party shall indemnify the other party and hold it harmless from paying its own business costs or taxes.

18.10   Arbitration. Any dispute or claim arising out of or in connection with this Agreement, except as provided in Section 18.12, will be finally settled by binding arbitration, in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association by one arbitrator appointed in accordance with said rules. The arbitrator shall apply Tennessee law, without reference to rules of conflicts of law or rules of statutory arbitration, to the resolution of any dispute. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction for preliminary or interim equitable relief, or to compel arbitration in accordance with the paragraph, without breach of this arbitration provision.

18.11   Attorney's Fees. If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

18.12   Limited Exception to Arbitration. Each party acknowledges and agrees that damages at law for a breach of Section 3, as to Licenses, of Section 9, as to Confidential Information, of Section 10, as to Exclusivity and Non-Compete, and of Section 16, as to Ownership are inadequate as a matter of law, and not subject to further factual inquiry upon a judicial determination that said Sections have been or may be breached. In recognition of the agreed upon inadequacy of damages at law, each party agrees that, in the event of such a breach by the other party, in addition to any damages at law, the non-breaching party shall be entitled to obtain equitable relief in the form of specific performance, temporary

restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

18.13  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

18.14  Advice of Legal Counsel. Each party acknowledges and represents that, in executing this Agreement, it has had the opportunity to seek advice as to its legal rights from legal counsel and that the person signing on its behalf has read and understood all of the terms and provisions of this Agreement. This Agreement shall not be construed against any party by reason of the drafting or preparation thereof.

18.15  Exhibits. All Exhibits to this Agreement shall constitute part of this Agreement and shall be deemed top be incorporated herein by reference in their entirety and made a part hereof, as if set out in full at the point where they first are mentioned.

The parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

PUBLISHER

ROBERT J. FIRTH
(Print Name)

_____
(Signature)

Date:  8/19/03

Title:  President

Company:  Blue + Gold Illustrated

Address:  1605 N. Home St.

Mishawaka, IN

46545

SSN/FEIN:  35 - 1512952

Phone:  (day) (574) 255-9800

(cell) (574) 286-5798

Email:  _____

RIVALS

SHANNON TCAFY
(Print Name)

_____
(Signature)

Date:  8/19/2003

Title:  PRES

## Bob Firth

**From:** John J. Devins [jdevins@gmail.com]
**Sent:** Wednesday, August 02, 2006 3:45 PM
**To:** bfirth@blueandgold.com; Firth, John
**Cc:** Liz Devins
**Subject:** Fwd: ND Club of Milwaukee: New Communications Director

Thought everyone should see this.  Interesting part in **BOLD**.

---------- Forwarded message ----------
From: ND Club of Milwaukee <jfq1@wi.rr.com>
Date: Aug 2, 2006 12:47 PM
Subject: ND Club of Milwaukee:  New Communications Director
To: jdevins@alumni.nd.edu

The Blue-Gold Luncheon has been re-named!

It is now called "The Notre Dame Football Lunch", and will be held at the Italian Community
Center on Thursday, August 17 starting at 11:30am.

**This year's speaker will be Tim Prister, who founded Blue-Gold Illustrated.**

Tickets are $20 in advance, $25 at the door.

Advance ticket reservations can be made through Steve Knauf, at (920) 876-2742.  Or you can
email him, at:  mknauf@wi.rr.com

For advance tickets, send $20 to:

Steve Knauf
57 Point Elkhart Drive
Elkhart Lake, WI  53020

Thanks, and hope to see you there!  GO IRISH!

Joshua Quinn
Director of Communications
ND Club of Milwaukee
(414) 793-1642

11/17/2009

**Bob Firth**

**From:**    Tim Goodenow [tgoodenow@blueandgold.com]
**Sent:**    Sunday, November 05, 2006 11:07 PM
**To:**      bfirth@blueandgold.com
**Subject:** Rivals using our slogan

FYI...

**Previous Topic** | **Next Topic** | **Back to Topics**

**Jack @ Rivals**          **Audio: Fighting Irish Preview with Tim Prister and Phil Houk**                               **Reply**


Live From Rivals
ADMIN
Post #3034                 North Carolina at NOTRE DAME

                           Brady Quinn for Heisman! and the Irish continue to roll. Next up:
                           North Carolina. Click on to hear all about it from America's foremost
                           authority on Notre Dame football: Tim Prister of IrishIllustrated.com,
                           and broadcast veteran "The Judge" Phil Houk. In just 20 minutes you
                           will be up to date on the Fighting Irish!

                           Link: Listen to Fighting Irish Preview
                                    Jack Freeman
                                    Publisher Irish Illustrated
                                    Email Me

                           Posted on 11/3 9:49 AM | IP: Logged

Tim Goodenow
Blue and Gold Illustrated
1605 N Home Street
Mishawaka, IN 46545

Phone: 574-255-9800
Fax: 574-255-9700
www.BlueandGold.com

*This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or
have received this e-mail in error) please notify the sender immediately and destroy and delete all copies
of this e-mail and any attachments. Any unauthorized copying, disclosure or distribution of the material in
this e-mail is strictly forbidden.*

11/17/2009

## Bob Firth

**From:** Michelle Hamilton [michelle@blueandgold.com]
**Sent:** Thursday, November 30, 2006 1:25 PM
**To:** 'Robert Firth'
**Subject:** FW: [SPAM] FYI

Here is the email Tim sent regarding Tim.

---

**From:** Michelle Hamilton [mailto:michelle@blueandgold.com]
**Sent:** Wednesday, November 29, 2006 9:56 PM
**To:** 'Melissa Vallone'
**Cc:** 'Robert Firth'
**Subject:** FW: [SPAM] FYI

Melissa,

Just wanted to send this to you as further proof of the use of our masthead tag line by Rivals. I'll get back to you after reading the letter.

Michelle

---

**From:** Tim Goodenow [mailto:tgoodenow@blueandgold.com]
**Sent:** Saturday, November 25, 2006 12:53 AM
**To:** 'Michelle Hamilton'
**Subject:** [SPAM] FYI

**Jack @ Rivals**



Live From Rivals
ADMIN
Post #3147

**Audio: Fighting Irish Preview with Tim Prister and Phil Houk**                    **Reply**

Fighting Irish at USC

This game promises to be another extraordinary moment in time, like so many of the match-ups between these two powerhouses. Click on here for 20 minutes of the inside scoop from America's foremost authority on Notre Dame football, Tim Prister of IrishIllustrated.com and broadcast veteran "The Judge" Phil Houk. It is the 147th edition of : FIGHTING IRISH PREVIEW.        *Name of annual PREVIEW*

*This post was edited on 11/24 8:51 PM by Jack @ Rivals*

Link: Audio: Fighting Irish Preview - USC
        Jack Freeman
        Publisher Irish Illustrated
        Email Me
**rivals.com**

Posted on 11/24 2:15 PM | IP: Logged

Here is the 20 minute show...

http://production.federatedmedia.com/ftpfolder/Fighting Irish Preview 11-25-06 USC.mp3

11/17/2009

**Bob Firth**

| | |
|---|---|
| **From:** | Michelle Hamilton [michelle@blueandgold.com] |
| **Sent:** | Tuesday, November 14, 2006 10:23 AM |
| **To:** | 'Melissa Vallone' |
| **Cc:** | 'Peter Trybula'; Bob Firth |
| **Subject:** | FW: Rivals using our slogan |

**Attachments:**      image001.gif; image002.gif; image003.jpg; image004.jpg

   

image001.gif (164   image002.gif (2 KB)   Image003.jpg (3   Image004.jpg (3
B)                          KB)            KB)

                                          Melissa,

Bob Firth would like a letter drafted to Tim Prister, cc Rivals to put them on notice that
the use of America's foremost authority on Notre Dame football (below) is too similar to
our tag line for BGI newspaper (America's foremost authority on Fighting Irish football)
and that he must cease and desist. Also any references to Tim as the founder without the
correction of Prister will also not be tolerated.

Bob does not at this point want to pursue anything legally, but would like a trail that we
are watching what he is doing and if in the future, we will pursue legal action if
necessary. Please call me if I need to clarify or have a conversation with Bob. He hurt
his hand and had surgery, so he is only in the office for about 2 hours a day.

Thanks,

Michelle

(574)255-9800

From: Tim Goodenow [mailto:tgoodenow@blueandgold.com]
Sent: Monday, November 06, 2006 9:36 AM
To: 'Michelle Hamilton'; 'Dave Follett'
Subject: FW: Rivals using our slogan

From: Tim Goodenow [mailto:tgoodenow@blueandgold.com]
Sent: Sunday, November 05, 2006 11:07 PM
To: 'bfirth@blueandgold.com'
Subject: Rivals using our slogan

FYI.

1

## Bob Firth

| | |
|---|---|
| **From:** | Michelle Hamilton [michelle@blueandgold.com] |
| **Sent:** | Wednesday, November 29, 2006 9:48 PM |
| **To:** | 'Melissa Vallone' |
| **Cc:** | 'Peter Trybula'; 'Robert Firth' |
| **Subject:** | RE: Rivals.com Cease and Desist Letter (#103551) |

Melissa,

Thank you for this draft - I will be in the office tomorrow and will discuss it with Bob then.

Michelle

-----Original Message-----
From: Melissa Vallone [mailto:Melissa.Vallone@BTLaw.com]
Sent: Tuesday, November 28, 2006 12:35 PM
To: michelle@blueandgold.com
Cc: Peter Trybula
Subject: Rivals.com Cease and Desist Letter (#103551)

Dear Michelle:

Attached please find a draft cease and desist letter to be sent to Rivals.com. We are sending the letter to Rivals.com with a copy to Tim Prister, as the actions which are offensive are being done under Rivals'
corporate umbrella.

In addition, please note that there is a blank in the letter where I need you to advise me as to the earliest first use date of the trademark AMERICA'S FOREMOST AUTHORITY ON FIGHTING IRISH FOOTBALL. Also, please advise of any other necessary changes. We will only send this letter upon receiving your approval.

We look forward to hearing from you.

Best,

Melissa


Melissa A. Vallone
BARNES & THORNBURG LLP
One North Wacker Drive
Suite 4400
Chicago, Illinois   60606-2809
312-214-8314
312-759-5646 (fax)
mvallone@btlaw.com


------------------------------------------
CONFIDENTIALITY NOTICE:  This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system.  We do not waive attorney-client or work product privilege by the transmission of this message.

TAX ADVICE NOTICE:  Tax advice, if any, contained in this e-mail does not constitute a "reliance opinion" as defined in IRS Circular 230 and may not be used to establish

1

November 28, 2006

*VIA EMAIL and US MAIL*
Rivals.com
P.O. Box 1604
Brentwood, TN 37024-1604
Attn: General Counsel

      Re:    Infringement of Fan Action, Inc. Trademark and Unfair Competition
              Our Reference No. 42743-103551

Dear Sir/Madam:

We are intellectual property litigation counsel to Fan Action, Inc. ("Fan Action"), the publisher of *Blue & Gold Illustrated*. Fan Action has recently discovered that Rivals.com is infringing Fan Action's trademark rights and engaging in other practices of unfair competition.

As Rivals.com undoubtedly knows from its prior relationship with Fan Action, Fan Action has been an established publisher of news and events related to Notre Dame sports. Fan Action, in its business, has used and continues to use the trademark AMERICA'S FOREMOST AUTHORITY ON FIGHTING IRISH FOOTBALL (the "Fan Action Trademark"). The Fan Action Trademark has been in use in connection with the publication of the *Blue and Gold Illustrated* newspaper since at least as early as _____. Through this long-standing and continuous use, Fan Action has built up substantial goodwill in the Fan Action Trademark. The Fan Action Trademark is an invaluable asset to Fan Action.

We have recently found that Rivals.com is using the slogan AMERICA'S FOREMOST AUTHORITY ON NOTRE DAME FOOTBALL for its competing publication. This slogan is highly similar to the Fan Action Trademark. The only difference between the two marks is the identifying noun for Notre Dame University and its sports teams. The use of this slogan by Rivals.com is likely to cause confusion, mistake and deception in the mind of consumers and amounts to trademark infringement and unfair competition and falsely implies that Rivals.com is somehow affiliated with, sponsored or endorsed by Fan Action.

Furthermore, it appears from this action and other actions of Rivals.com and the intimate knowledge that Rivals.com and its staff has regarding Fan Action, that the selection of this slogan was and is intended to deliberately trade upon the goodwill of Fan Action.

Rivals.com
November 28, 2006
Page 2

We have also found that you have advertised your employee Tim Prister as being a "founder" of Fan Action and its *Blue and Gold* publications and website. As you know, this is a false statement. Mr. Prister was an employee of Fan Action and not a founder of Fan Action or any of its *Blue and Gold* publications and websites. Rivals.com is apparently making this statement in an attempt to once again pass itself off as Fan Action.

Given the egregious nature of Rivals.com's conduct, Fan Action demands that Rivals.com immediately:

1. cease and desist any and all use of the AMERICA'S FOREMOST AUTHORITY ON NOTRE DAME FOOTBALL slogan;

2. cease and desist representing in any fashion or manner whatsoever that Mr. Prister was or is a founder of Fan Action or any of its *Blue and Gold* publications or websites.

Because this matter is of considerable importance to Fan Action, we need your response to these demands by no later close of business on December __, 2006.

This letter is not intended to be and should not be construed as a waiver of any claims or demands that Fan Action has against Rivals.com and Mr. Prister for these actions or any other actions. Fan Action reserves its rights against both Mr. Prister and Rivals.com for any unauthorized use of its intellectual property.

Very truly yours,

BARNES & THORNBURG LLP


Melissa A. Vallone

MAV/dlp
cc:     Peter G. Trybula, Esq.
        Ms. Michelle Hamilton

<u>EMPLOYMENT AND NON-COMPETE AGREEMENT</u>

THIS AGREEMENT made and entered into as of the 21st day March, 1994 between FAN ACTION, INC., an Indiana Corporation, hereinafter referred to as the "Corporation" and TIMOTHY PRISTER, hereinafter referred to as the "Employee."

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and the Stock Option and Transfer Restriction Agreement of even date herewith, the parties hereto agree as follows:

1.   **EMPLOYMENT.** The parties agree that the employment of the Employee shall continue as Editor and to serve and perform such duties as may be assigned by the Corporation, in such a manner and at such time and place as the Corporation shall direct.

2.   **DURATION OF AGREEMENT.** This Agreement shall be effective as of the 21st day of March, 1994 and shall remain in effect until the 20th day of March, 1995.   Unless sooner terminated, this Agreement shall automatically renew for successive one (1) year terms.   Notwithstanding anything to the contrary herein, either party may terminate this Agreement, at any time, upon two (2) weeks written notice to the other party and the Corporation may terminate this Agreement immediately for cause.  As used herein "cause" shall mean i) theft or embezzlement, or attempted theft or embezzlement, of money or tangible or intangible assets or property of the Corporation, perpetration or attempted perpetration of fraud, or participation in a fraud or attempted fraud, on the Corporation, (ii)   the Employee's inability to carry out effectively the Employee's duties and obligations to the Corporation, (iii) dishonesty in connection with dealings with the management of the Corporation, (iv) willful misconduct in the performance of the Employee's duties, (v) conviction of a felony, or (vi) a willful and material breach of this Agreement.   The Employee shall be entitled to the compensation accrued as of the effective date of termination but shall have no other claim against the Corporation.

3.   **OBLIGATIONS OF EMPLOYEE.** The Employee agrees to perform faithfully all of the duties assigned to him to the best of his abilities, and to adhere strictly at all times to the rules and regulations of the Corporation.   The Employee further agrees that he will devote his full time and attention to the business of the Corporation during the working hours which are assigned to him by the Corporation.

4.   **COMPENSATION.** The Corporation agrees to pay to Employee, during the period of his employment hereunder as follows:

a.   <u>Base Salary.</u>   The Employee shall be paid the sum of Fifty-nine Thousand ($59,000.00) Dollars per year in bi-weekly installments or other installments in accordance with the general practice of the Corporation.

b.   <u>Bonus</u>.  The Employee shall be eligible for an annual bonus in the sole discretion of the Board of Directors of the Corporation.

5.   **EMPLOYEE BENEFIT PLANS.**  The Employee shall be entitled to participate in any group medical or term life insurance plan, or any other Employee benefit plan which is presently existing or which may be established in the future by the Corporation, on the same terms and conditions as other employees of the Corporation.

6.   **VACATIONS AND HOLIDAYS.**  The Employee shall be entitled to paid vacations and holidays in accordance with the general practices of the Corporation, as amended from time to time, provided that vacations may not be accrued or carried forward into succeeding years.

7.   **PROTECTION OF TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION.**  The parties agree and acknowledge that by virtue of the Employee's position with the Corporation, the Employee will necessarily have full and complete access to all trade secrets, specialized marketing and distribution practices and techniques, financial information, subscriber information and other information, data and knowledge which may be of a confidential and sensitive nature, all of which the parties further agree are so vital to the continued success of the Corporation as to be protected against being disclosed or divulged by the Employee to persons not in the Corporation's employ, particularly those who compete with the Corporation in publishing and other disseminating information concerning the University of Notre Dame and its athletic programs and for any other product or service marketed or provided by the Corporation.

The Employee then, in addition to any other limitation, regardless of the circumstances of the termination of his employment with the Corporation, specifically agrees that:

A.   He will not, whether during the term of his employment or subsequent to the termination of his employment, in any fashion, form or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm or corporation, in any manner whatsoever, any information of any kind, nature or description, concerning any matters affecting or relating to the Corporation's business. Such matters include, but are not limited to, the names, addresses, phone numbers or particular desires or needs of customers or advertisers of the Corporation, the prices charged or costs associated with the Corporation's services or products, or information concerning product or market development and distribution without regard to the probability that any or all of the foregoing matters would not be deemed confidential, material, or important enough to warrant protection as a trade secret in the

2

absence of a written agreement designating such
information as "confidential" and expressly restricting
the use of such information. Therefore, this Agreement
is intended to afford the Corporation with certain
protections that it would otherwise not be entitled to
and with this purpose in mind, the parties hereto
stipulate that, as between them, the same are important,
material and confidential, and gravely affect the
successful conduct of the Corporation's business and its
goodwill, and that any breach of the terms of this
subparagraph is a material breach of this Agreement.
This subparagraph will not be deemed to prevent the
employee from disclosing such matters if such disclosure
is necessary to the Corporation's business and to the
performance of the Employee's duties under this
Agreement, so long as such disclosure does not involve a
trade secret or other theretofore undisclosed matter, and
the Employee makes such disclosure under circumstances
and in a manner reasonably calculated to benefit the
Corporation, as opposed to the Employee or actual or
potential competitors of the Corporation.

8.   **RESTRICTIVE COVENANTS.**   The Corporation and Employee
agree that the Corporation is engaged in publishing a news magazine
devoted primarily to covering the University of Notre Dame and its
athletic programs and related literature and information (the
"Corporation's Business") and information services and has built up
and established a valuable and extensive trade in this market.
Employee expressly agrees, as further consideration of his
continued employment, the payment of his wages and the agreement to
pay benefits as herein provided, if the Employee's relationship
with the Corporation terminates for any reason, then for a period
of two (2) years thereafter the Employee shall not and he agrees
that he will not, directly or indirectly, do any of the foll

A)   Own an interest in, operate, join, control, or
participate in, or be connected as an officer, employee,
agent, independent contractor, partner, shareholder, or
principal of or in any corporation, partnership,
proprietorship, firm, association or other e
developing, soliciting orders for, selling, distribut...,
or otherwise marketing products, goods and/or services
which directly or indirectly, compete with the
Corporation's Business. The Employee acknowledges that,
in view of the scope of the Corporation's Business, the
area in which the Employee shall be precluded from
competing is both reasonable and reasonably required for
the protection of the Corporation.

B)   Own an interest in, operate, join, control, or
participate in, or be connected as an officer, employee,
agent, independent contractor, partner, shareholder, or

3

principal of or in <u>The South Bend Tribune</u>, <u>The Irish Sports Report</u>, Schurz Communications, or any entity affiliated with or under common ownership or control of any of the foregoing.

C) Induce or influence or attempt to induce or influence, any person who is engaged as an employee, agent, broker, independent contractor, or otherwise by the Corporation, to terminate his or her engagement or to engage or otherwise participate in a business actively, directly, or indirectly, competitive with the Corporation's business;

D) Either for himself or for any other person, firm, or corporation, divert or take away, or attempt to divert or take away, call upon or solicit or attempt to call upon or solicit, any of the customers of advertisers of the Corporation, or potential customers or advertisers of the Corporation or distributors of the Corporation's products or services, whom he called upon or whom he solicited or with whom he became acquainted while in the employ of the Corporation;

E) Make any use of the information described in subparagraph 7(A) above or cause or attempt to cause any other person to use such information, for purposes other than the business of the Corporation; or

F) Undertake planning for, or organization of, any business activity, competitive with the Corporation's business, or combine or conspire with other employees of the Corporation for the purpose of organizing any such competitive business activity.

It is further agreed that the restrictive covenants contained in this paragraph 8 shall be limited to the Continental United States. The parties agree and acknowledge that the above restrictive covenants are both reasonable and necessary to protect the interest of the Corporation as to geographical area, scope of restricted activity and duration.

Nothing contained in this paragraph 8 shall be deemed a waiver of the Employee's obligation under paragraph 7 above, and in the event of any conflict or inconsistency between the provisions of this paragraph 8 and paragraph 7 above, the provisions of paragraph 7 above shall control.

9. BOOKS AND RECORDS. In the event of termination for any reason, the Employee shall deliver promptly to the Corporation the originals and all copies of any notes, books, correspondence, lists of customers, distributors and advertisers, lists of potential customers, distributors, and advertisers and all other records

4

whether written, magnetic or otherwise relating to the Corporation's business which are in the Employee's possession or under his control as of the date of termination.

10.   **SEVERABILITY.**  The Corporation and Employee agree that the restrictive covenants contained in paragraphs 7, 8 and 9 are' severable and separate, and the unenforceability of any specific covenant herein shall not affect the validity of any other covenant set forth herein.  These covenants on the part of Employee shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Employee against the Corporation whether predicated on this Agreement or otherwise and shall not constitute a defense to the enforcement by the Corporation of said covenants.

If any court of competent jurisdiction shall determine that the time period or the territory herein restricting competition is unreasonable, said covenants shall not be determined to be null and void and of no effect, but shall be reformed by said court to impose a reasonable time period or reasonable territorial limitation, as the case may be.

11.   **SURVIVAL OF COVENANTS.**  This Agreement shall be binding upon and inure to the benefit of any successors or heirs or representatives of the parties hereto.  The restrictive covenants and promises of the Employee contained in this Agreement shall survive any termination or recision of this Agreement unless the Corporation executes a written agreement specifically releasing the Employee from such covenants.

12.   **LEGAL AND EQUITABLE RELIEF.**   The parties hereby acknowledge and agree that in the event of the breach by Employee of any of the restrictions contained in paragraphs 7, 8, or 9 of this Agreement, the Corporation shall be entitled to injunctive or equitable relief both during dependency of the action and permanently, without the necessity for the posting of bond, or other security, since the remedy at law would be inadequate and insufficient to prevent a breach of this Agreement, of any part of it, and to secure the enforcement of this Agreement.  In addition, the Corporation bringing such action shall be entitled to such other remedies in law, in equity, or under this Agreement, as may be available, including, without limitation, reasonable attorneys fees and such damages as it can show that it has sustained by reason of such breach.

13.   **ENTIRE AGREEMENT.**  This Agreement constitutes the entire Agreement between the parties and no other agreements, written or oral exist.

14.   **MODIFICATION.**  This Agreement may be altered by written agreement only.

15.   **INDIANA LAW.**  This Agreement shall be interpreted by the laws of the State of Indiana and no provision in this Agreement shall be interpreted for or against any party because that party or its legal representative drafted the provision.

16.   **DESCRIPTIVE HEADINGS.**   The descriptive headings used herein are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.


"CORPORATION"                "EMPLOYEE"
Fan Action, Inc.

By: John C. Firth              Timothy Prister
Its: President


ea/fanactio.tp
050694

# BAKER & DANIELS LLP

EST. 1863

First Bank Building, 205 W. Jefferson Blvd., Suite 250 • South Bend, Indiana 46601
Tel. 574.234.4149 • Fax 574.239.1900
www.bakerdaniels.com

GERARD T. GALLAGHER
Attorney at Law
Direct 574.239.1921
gerard.gallagher@bakerd.com

INDIANA
WASHINGTON, D.C.
CHINA

April 21, 2006

Mr. Greg Gough
Rivals.com
P. O. Box 1604
Brentwood, TN  37024-1604

> Re:   Fan Action, Inc.
>        Our Reference: FAN-L0002

Dear Mr. Gough:

We represent Fan Action, Inc. ("Fan Action"). Fan Action is the owner of U.S. Trademark Registration Nos. 2,435,576 and 2,297,533 for the mark BLUE AND GOLD TRADITIONS and Design. Fan Action also owns U.S. Trademark Application Serial No. 78/809,066 for the mark BLUE AND GOLD, which it uses in connection with various printed publications and websites relating to college athletics, and, in particular, the athletic programs of the University of Notre Dame. We assume you are well aware of Fan Action's Blue and Gold Illustrated publication (also known as BGI) and its www.blueandgold.com web site. Through its extensive promotional activities, Fan Action's Blue and Gold publication as well as the BLUE AND GOLD and BGI trademarks have become widely recognized and associated exclusively with Fan Action.

Through the internet addresses www.bgi.rivals and bgi.rivals.com, Rivals is using Fan Action's trademark in order to direct internet users to a competing Rivals website. In addition, Rivals is also using meta tags on its site in order to influence search engines, such as Google.com, to list Rival's website when a user does a search for "Blue and Gold Illustrated."

Given these factors, it is clear that Rivals' use of the marks BGI and BLUE AND GOLD ILLUSTRATED is likely to cause confusion and mistakes and to deceive consumers. In particular, consumers viewing Rivals' use of the BGI and BLUE AND GOLD ILLUSTRATED marks in conjunction with Rivals' goods and services will wrongly believe that Rivals actually offers the goods and services of Fan Action or that Rivals' goods and services are somehow approved by or affiliated with Fan Action. Accordingly, Rivals' use of BGI or BLUE AND GOLD ILLUSTRATED is likely to cause confusion or to cause mistakes or to deceive as to the affiliation, connection or association of Rivals with Fan Action, and as to the origin, sponsorship and approval of Rivals' goods and services or other commercial activity by Fan Action.

BDDB01 4334600v2

Mr. Greg Gough                          -2-                          April 21, 2006

Rivals' use of the BGI and BLUE AND GOLD ILLUSTRATED marks infringes Fan Action's trademark rights and constitutes unfair competition, all in violation of 15 U.S.C. §§1114, 1125 and common law. Such infringement and acts of unfair competition have caused and will continue to cause irreparable harm and damage to Fan Action.

Accordingly, we demand that Rivals:

(1) cease all use of the www.bgi.rivals.com and bgi.rivals.com web addresses, and any and all other trademarks, trade names and domain names that are likely to cause confusion with our client's trademarks or that otherwise infringe our client's rights;

(2) remove the BLUE AND GOLD ILLUSTRATED meta tags from your website, as well as any and all other trademarks, trade names and domain names that are likely to cause confusion with our client's trademarks or that otherwise infringe our client's rights;

(3) cease any and all use of the BGI and BLUE AND GOLD ILLUSTRATED marks, as well as any and all other trademarks, trade names and domain names that are likely to cause confusion with our client's BGI and BLUE AND GOLD ILLUSTRATED marks or that otherwise infringe our client's rights on and in connection with the manufacture, marketing, sale, promotion, display and distribution of printed publications and web sites relating to college athletics; and

(4) deliver to Fan Action at no cost any and all other materials bearing or utilizing the BGI or BLUE AND GOLD ILLUSTRATED marks in Rivals' possession, custody or control, including, but not limited to, advertising of the goods and services provided by rival.com.

Please provide to us your written confirmation that you will comply with these requests within weeks of receipt of this letter. We look forward to hearing from you.

Very truly yours,

BAKER & DANIELS LLP

Gerard T. Gallagher

GTG:rac
cc:     Mr. Robert Firth

No Reference
To Go Blue &. Add.Com
J. Reference

March 9, 2006

Mr. Greg Gough
Rival.com
7107 Executive Center Drive, Suite 100
Brentwood, TN 37027

>          Re:     Fan Action, Inc.
>                  Our Reference: FAN-L0002

Dear Mr. Gough:

We represent Fan Action, Inc. ("Fan Action"). Fan Action is the owner of U.S. Trademark Registration Nos. 2,435,576 and 2,297,533 for the mark BLUE AND GOLD TRADITIONS and Design. Fan Action also owns U.S. Trademark Application Serial No. 78/809,066 for the mark BLUE AND GOLD, which it uses in connection with various printed publications and websites relating to college athletics, and, in particular, the athletic programs of the University of Notre Dame. We assume you are well aware of Fan Action's Blue and Gold Illustrated publication (also known as BGI) and its www.blueandgold.com web site.  Through its extensive promotional activities, Fan Action's Blue and Gold publication as well as the BLUE AND GOLD and BGI trademarks have become widely recognized and associated exclusively with Fan Action.

Through the internet address www.bgi.rivals, rivals.com ("Rivals") is using Fan Action's trademark in order to direct internet users to a competing Rivals website.  In addition, Rivals is also using meta tags on its site in order to influence search engines, such as Google.com, to list Rival's website when a user does a search for "Blue and Gold Illustrated."

Given these factors, it is clear that Rivals' use of the marks BGI and BLUE AND GOLD ILLUSTRATED is likely to cause confusion and mistakes and to deceive consumers.  In particular, consumers viewing Rivals' use of the BGI and BLUE AND GOLD ILLUSTRATED marks in conjunction with Rivals' goods and services will wrongly believe that Rivals actually offers the goods and services of Fan Action or that Rivals' goods and services are somehow approved by or affiliated with Fan Action.  Accordingly, Rivals' use of BGI or BLUE AND GOLD ILLUSTRATED is likely to cause confusion or to cause mistakes or to deceive as to the affiliation, connection or association of Rivals with Fan Action, and as to the origin, sponsorship and approval of Rivals' goods and services or other commercial activity by Fan Action.

Mr. Greg Gough                                    -2-                                    March 9, 2006

Rivals' use of the BGI and BLUE AND GOLD ILLUSTRATED marks infringes Fan Action's trademark rights and constitutes unfair competition, all in violation of 15 U.S.C. §§1114, 1125 and common law. Such infringement and acts of unfair competition have caused and will continue to cause irreparable harm and damage to Fan Action.

Accordingly, we demand that Rivals:

(1) cease all use of the bgi.rivals.com web address, and any and all other trademarks, trade names and domain names that are likely to cause confusion with our client's trademarks or that otherwise infringe our client's rights;

(2) remove the BLUE AND GOLD ILLUSTRATED meta tags from your website, as well as any and all other trademarks, trade names and domain names that are likely to cause confusion with our client's trademarks or that otherwise infringe our client's rights;

(3) cease any and all use of the BGI and BLUE AND GOLD ILLUSTRATED marks, as well as any and all other trademarks, trade names and domain names that are likely to cause confusion with our client's BGI and BLUE AND GOLD ILLUSTRATED marks or that otherwise infringe our client's rights on and in connection with the manufacture, marketing, sale, promotion, display and distribution of printed publications and web sites relating to college athletics; and

(4) deliver to Fan Action at no cost any and all other materials bearing or utilizing the BGI or BLUE AND GOLD ILLUSTRATED marks in Rivals' possession, custody or control, including, but not limited to, advertising of the goods and services provided by rival.com.

Please provide to us your written confirmation that you will comply with these requests within weeks of receipt of this letter. We look forward to hearing from you.

Very truly yours,

BAKER & DANIELS LLP


Gerard T. Gallagher

GTG:rac
cc:     Mr. Robert Firth

# BAKER & DANIELS LLP

EST. 1863

First Bank Building. 205 W. Jefferson Blvd., Suite 250 • South Bend. Indiana 46601
Tel. 574.234.4149 • Fax 574.239.1900
www.bakerdaniels.com

DAVID R. PRUITT
Attorney at Law
Direct 574.239.1903
david.pruitt@bakerd.com



INDIANA
WASHINGTON, D.C.
CHINA

August 17, 2005

*Via Certified Mail/Return Receipt Requested*
*Certified Mail Receipt No. 7111 1166 0620 0001 5480*
*And First Class Mail*

Mr. Tim Prister
21606 Carriage Dr.
South Bend, IN  46614

### Re:   **Fan Action, Inc.**

Dear Mr. Prister:

This law firm represents Fan Action, Inc. We understand your relationship as an independent contractor with Fan Action has recently terminated and understand that you have told Fan Action that you have signed a "contract" with Rivals.com. We are writing to remind you of your continuing legal obligations under the Independent Contractor Agreement between you and Fan Action dated August 30, 2004 (the "Agreement"), a copy of which is enclosed for your reference.

In the Agreement, you agreed to be bound by certain covenants for a period of 15 months following the termination of your relationship with Fan Action. Specifically, you agreed, among other things, not to

> own an interest in, operate, join, control or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of or in any corporation, partnership, proprietorship, firm association, or other entity, developing, soliciting orders for, selling, distributing, or otherwise marketing products, goods and/or services which directly, or indirectly, compete with the Corporation's Business. The Contractor acknowledges that, in view of the scope of the Corporation's Business, the area in which the Contractor shall be precluded from competing is both reasonable and reasonably required for the protection of the Corporation.

Section 2B(i). Additionally, you agreed not to "divert or take away, or attempt to divert or take away . . . any of the customers of the Corporation." *Id.* at 2B(iv).

By your own admission, you are currently employed by Rivals.com, a direct competitor of Fan Action. Moreover, Fan Action recently learned that you have been writing, without our knowledge, for various

BDDB01 4150188v1

Mr. Tim Prister                                    -2-                              August 17, 2005

Indiana newspapers about the University of Notre Dame. Additionally, we know that as of August 15, 2005 you were extensively questioning Coach Weis of the University of Notre Dame after evening practice. Such conduct by you plainly violates your contractual obligations under the Agreement.

Fan Action demands that you immediately cease and desist from further violations of your Agreement. Fan Action further demands that you comply fully with all of your continuing legal obligations under the Agreement. In particular, your employment with Rivals.com violates the Agreement.

Please advise me immediately in writing whether you intend to comply with the foregoing demand and discontinue any further activities in breach of the Agreement. If you fail to provide a satisfactory written response by close of business on August 19, 2005, we will presume that you are continuing to engage in activities in violation of the Agreement. Please be advised that unless your conduct in violation of the Agreement ceases immediately, Fan Action stands ready to pursue all available equitable and legal remedies against you to protect its contractual and other legal rights.

By copy of this letter to Shannon Terry at Rivals.com, we are placing Rivals.com on notice of your obligations under the Agreement and Fan Action's demand that you cease and desist any activities in violation of the Agreement. Fan Action also demands that Rivals.com not induce, or assist in, any breaches of your obligations under the Agreement.

This letter is without prejudice, and Fan Action reserves all of its rights and remedies under the Agreement and all applicable laws. We expect that you and Rivals.com will understand the seriousness of this matter and will comply immediately and fully with the foregoing demands.

Very truly yours,

BAKER & DANIELS LLP

David R. Pruitt

Enclosure

cc:      Shannon Terry (w/enclosure, via certified mail, return receipt requested)



## BAKER & DANIELS LLP

EST. 1883

First Bank Building, 205 W. Jefferson Blvd., Suite 250 • South Bend, Indiana 46601
Tel. 574.234.4149 • Fax 574.239.1900
www.bakerdaniels.com

EDWARD A. SULLIVAN III
Attorney at Law
Direct 574.239.1930
ed.sullivan@bakerd.com

INDIANA
WASHINGTON, D.C.
CHINA

May 24, 2005

_VIA UPS NEXT-DAY AIR_

Mr. Shannon Terry
President and Chief Executive Officer
JBS Sports, Inc. (d/b/a Rivals.com)
10 Cadillac Drive, Suite 400
Brentwood, TN 37027

Re:   Attempts by JBS Sports to Interfere with Fan Action's Ability to Perform Under that
      Certain Network Affiliate Agreement dated August 10, 2003 and to Undermine Fan
      Action's Goodwill in the Industry

Dear Mr. Terry:

We represent Fan Action, Inc. We have been advised that you recently solicited and hired three
of Fan Action's employees to work for JBS Sports. It is our further understanding that you
previously attempted to hire Tim Prister and were advised by him that he was under contract
with our client. Our client has reason to believe that you are continuing to attempt to negotiate
with Tim Prister regarding a potential employment/contractor arrangement to write for JBS
Sports. Be advised that Mr. Prister is under contract with our client and is bound by a covenant
not to compete. Should JBS Sports persist in trying to induce Mr. Prister to violate his non-
compete, Fan Action plans to use all means at its disposal to hold JBS Sports responsible for any
resulting loss of business and other damages. JBS Sports' efforts to lure away Fan Action's
writing staff appear calculated to undermine Fan Action's ability to perform its obligations under
the Network Affiliate Agreement and to unfairly hinder its ability to compete upon the
conclusion thereof. Further activity by JBS Sports in this vein will not be tolerated.

In this regard, for and on behalf of our client, we hereby demand that JBS Sports immediately
undertake the following steps:

1.   Immediately cease the solicitation of Tim Prister; and

2.   Immediately remove from any of your websites and message boards any posts
     concerning the future prospects of blueandgold.com and/or JBS Sports' recent hires of
     former Fan Action employees.

We look forward to hearing from you at your earliest convenience as time is of the essence in
these matters. Currently, our client is considering the need to file an action seeking all available
legal and equitable relief in respect of your actions to date to protect itself from further tortious
interference.

Mr. Shannon Terry
Page: 2
May 24, 2005

Very truly yours,

BAKER & DANIELS

Edward A. Sullivan, III

EAS/tjs

cc: Robert Firth

5-9-03

Bob,

Rivals approached me to write four stories a week for espn.com, as well as a taking part in a pay chat room that is entitled "The Leprechaun Lounge" in which I interact with subscribers to the cite.

This additional work would entail approximately 200 additional stories per year for espn.com, once-a-week visits to the "Lounge" to answer questions and any additional recruiting information that I could provide.

Bobby Burton indicated through Jack that they could pay me $500 a month for this service. I was told that the money would not be taken out of Blue & Gold Illustrated's cut for the other work I do for them. The $500 would come out of the money Rivals made from my additional endeavor.

I've now been told that the $500 that was paid to me in May was taken out of the profits owed to Blue & Gold Illustrated. This is contrary to my understanding of the agreement.

While I will admit in hindsight that it would have been better to approach you on this topic before agreeing to it, I also viewed it as work above and beyond my responsibilities with Blue & Gold Illustrated with regard to Rivals. My responsibilities to that website were never compromised as a result of this agreement.

I have not received a pay increase from Blue & Gold Illustrated for approximately four years as a result of the company's financial situation, although my responsibilities toward BGI's and Rivals' websites have accounted for an increase of stories written to approximately 750 per year.

I was simply trying to supplement my income through freelance work while not compromising my commitment to the company. Had I intended to deceive Blue & Gold Illustrated, I certainly would have gone to great lengths to make sure that my name did not appear on the statements sent from Rivals to BGI.

I hope you understand my perspective on this situation.

Sincerely,

Tim Prister
Editor

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

LITIGATION RELEASE NO.   15906  / September 24, 1998

SECURITIES  AND EXCHANGE COMMISSION v. CHARLES O. HUTTOE, ET AL.,
Civil Action No. 96-02543 (GK)(D.D.C.)

SEC WINS SUMMARY JUDGMENT AGAINST INTERNET MICROCAP STOCK TOUT

The Securities and Exchange Commission ("Commission")
announced that on September 14, 1998, the United States District
Court for the District of Columbia granted the Commission's
motion for summary judgment against ▓▓▓▓▓▓▓▓▓▓▓▓ ("Terry")
and Dunbar Holdings, Ltd., ("Dunbar"), the defendants in the case
arising out of the manipulation of the market for the securities
of Systems of Excellence, Inc. ("SOE").  The Court found that
Terry and Dunbar, Terry's wholly owned Bahamian shell company,
violated the antitouting and antifraud provisions of the
securities laws by touting and scalping the securities of SOE and
seventeen other microcap issuers.  The Court ordered Terry and
Dunbar to disgorge trading profits of $828,448 and certain other
compensation, together with prejudgment interest on that amount,
and permanently enjoined them future violations of Section 17(a)
of the Securities Act of 1933, Section 10(b) of the Securities
Exchange Act of 1934 and Rule 10b-5 thereunder.

In particular, the Court found the following:

☐ From August 1993 until November 1996 ▓▓▓▓▓ was employed by SGA
  Goldstar Research, Inc., publisher of the SGA Goldstar Whisper
  Stocks newsletter.  That newsletter profiled and made
  recommendations promoting largely unknown and untested penny
  stock or small capitalization companies, and was distributed
  over the internet and otherwise.

☐ ▓▓▓▓▓▓▓▓ duties included writing articles and commentaries
  about some of the companies, selling newsletter subscriptions
  and assisting in production and distribution of the
  newsletter.

☐ Companies paid SGA with stock in exchange for articles
  promoting their stock in the Whisper newsletter. ▓▓▓▓ got
  stock from SGA for companies he promoted in the articles he
  wrote.

☐ Continuously over a two year period, ▓▓▓▓▓ sold stocks after
  the Whisper newsletter recommended that its subscribers
  purchase those stocks.  Terry sold both stock that he received
  as compensation for touting the issuer and stock that he
  purchased in the market shortly before promotional articles
  appeared in the Whisper newsletter.

☐ ▓▓▓▓▓▓ failure to disclose that he had been given shares in
  exchange for promoting the companies in the newsletter
  violated the antitouting and the antifraud provisions of the
  securities laws.  The Court rejected a "disclaimer" that
  "personnel associated with SGA may own shares in the companies
  mentioned herein or may act as consultants thereto for
  compensation" as inadequate disclosure of those facts, and
  held that "[i]t is inherently misleading to present articles
  as objective reporting when they are in fact promotions paid
  for by the company featured."

☐ ▓▓▓▓▓▓▓▓▓ailure to disclose that he intended to sell his personal holdings of stock despite the recommendations to buy made in the Whisper newsletter -- a practice known as "scalping" -- separately violated the antifraud provisions of the securities laws.

☐ ▓▓▓▓▓▓▓▓ndisclosed touting and scalping separately defrauded subscribers to the newsletters. The Court ordered Terry and Dunbar to disgorge the commissions he earned for selling subscriptions to the Whisper newsletter.

The Court also rejected ▓▓▓▓▓▓▓and Dunbar's claims that Section 17(b) of the Exchange Act -- requiring disclosure of compensation received from an issuer, underwriter or dealer in exchange for publishing a description of a security -- violated the First and Fifth amendments of the Constitution as applied to them.

In the same decision, the Court denied the Commission's motion for summary judgment against J.S. Holdings, a relief defendant in the case. It also granted J.S. Holdings' motion to lift the preliminary injunctive relief previously imposed.

In other developments in recent months, the Commission has entered into settlements with, or dismissed from the litigation, seven additional relief defendants. On August 6, 1998, the Court ordered, pursuant to a consent in which she neither admitted nor denied the Commission's allegations, Nancy Ellis, aka Nancy Ellis Davis, aka Nancy Davis ("Ellis") to pay disgorgement of $3,579,770, which is the amount of illegal proceeds that she received from the SOE fraud. The settlement provided that upon the transfer by Ellis to the Court-appointed Receiver of $2,805,047 in bank accounts that were previously frozen in this case, collection of the remaining disgorgement would be waived in light of her demonstrated inability to pay based on the representations in Ellis's sworn financial statements. On August 17, 1998, those funds were transferred to the Receiver in full compliance with the Court's order. As part of the settlement with Ellis, the Commission agreed to dismiss without prejudice Ellis's son and daughter-in-law, relief defendants William K. Daw and Sonya Daw, from the litigation.

In addition, relief defendants Jack Weinstein, Nancy Weinstein, and Adobe Galleries Inc. ("Weinstein relief defendants") consented, without admitting or denying the Commission's allegations, to the entry of a final judgment in which the Court declared that they have no right, interest, or claim to three checks that they received from Ellis totaling $2,600,000 and ordered them to surrender these instruments. These three checks, drawn on accounts containing fraud proceeds, were the basis for the Commission's claims against the Weinstein relief defendants. The Court entered this final judgment on July 15, 1998. Finally, the Commission dismissed without prejudice relief defendant Lynda Lou Kane-Kraft from the ongoing litigation on April 10, 1998. Kane-Kraft's husband, Sheldon Kraft, settled on January 14, 1998 a related Commission action filed against him pursuant to which he paid to the Receiver $1,107,000 in cash, surrendered a vacation house, and assigned claims against his former employer. The Commission's settlement with Kraft, which virtually eliminated the combined assets of Kraft and Kane-Kraft, encompassed the relief that potentially could be obtained from Kane-Kraft.

The Commission previously has made several announcements concerning these matters. See Lit. Rel. 15888 (September 18, 1998); Lit. Rel. 15677 (March 19, 1998); Lit. Rel. 15617 (January

14, 1998); Lit. Rel. 15600 (December 22, 1997); Lit. Rel. 15571
(November 25, 1997); Lit. Rel. 15490 (September 12, 1997); Lit.
Rel. 15286 (March 12, 1997); Lit. Rel. 15490 (January 31, 1997);
Lit. Rel. 15185 (December 12, 1996); Lit. Rel. 15153 (November 7,
1996); Securities Exchange Act Rel. No. 33791 (October 7, 1996).

The Commission's investigation in this matter is continuing.

This enforcement action is part of the Commission's four-
pronged approach to minimizing Microcap fraud: enforcement,
inspections, investor education and regulation. For more
information about the SEC's response to Microcap fraud, visit the
SEC's Microcap Fraud Information Center at:

http://www.sec.gov/news/extra/microcap.htm.

## EMPLOYMENT AND NON-COMPETE AGREEMENT

**THIS AGREEMENT** made and entered into as of the 14th day of June, 2002, between Fan Action, Inc., an Indiana corporation, hereinafter referred to as the "Corporation", and Timothy Prister, hereinafter referred to as the "Employee".

**NOW, THEREFORE,** in consideration of the mutual covenants and conditions contained herein and the Stock Option and Transfer Restriction Agreement of even date herewith, the parties hereto agree as follows:

1. **EMPLOYMENT.** The parties agree that the employment of the Employee shall continue as Editor of <u>Blue & Gold Illustrated</u> and to serve and perform such duties as may be assigned by the Corporation, in such a manner and at such time and place as the Corporation shall direct.

2. **DURATION OF AGREEMENT.** This Agreement shall be effective as of the 14th day of June, 2002, and shall remain in effect until the 30th day of June, 2003. Unless sooner terminated, this Agreement shall automatically renew for successive one (1) year terms. Notwithstanding anything to the contrary herein, either party may terminate this Agreement, at any time, upon two (2) weeks written notice to the other party and the Corporation may terminate this Agreement immediately for cause. As used herein "cause" shall mean (i) theft or embezzlement, or attempted theft or embezzlement, of money or tangible or intangible assets or property of the Corporation, perpetration or attempted perpetration of fraud, or participation in a fraud, or attempted fraud, on the Corporation; (ii) the Employee's inability to carry out effectively the Employee's duties and obligations to the Corporation; (iii) dishonesty in connection with dealings with the management of the Corporation; (iv) willful misconduct in the performance of the Employee's duties; (v) conviction of a felony; or (vi) a willful and material breach of this Agreement. The Employee shall be entitled to the compensation accrued as of the effective date of termination but shall have no other claim against the Corporation.

3. **OBLIGATIONS OF EMPLOYEE.** The Employee agrees to perform faithfully all of the duties assigned to him to the best of his abilities. The Employee further agrees that he will devote his full time and attention to the business of the Corporation during the working hours which are assigned to him by the Corporation, which shall be until otherwise agreed to by the parties, as worked over the prior employment period.

4. **COMPENSATION.** The Corporation agrees to pay to Employee, during the period of his employment hereunder as follows:

a. **Base Salary.** The Employee shall be paid the sum of $73,000 annually in bi-weekly installments or other installments in accordance with the general practice of the Corporation.

1

5. **EMPLOYEE BENEFIT PLANS.** The Employee shall be entitled to participate in any group medical or term life insurance plan, or any other Employee benefit plan which is presently existing or which may be established in the future by the Corporation, on the same terms and conditions as other employees of the Corporation.

6. **VACATIONS AND HOLIDAYS.** The Employee shall be entitled to paid vacations and holidays in accordance with the general practices of the Corporation, as amended from time to time, provided that vacations may not be accrued or carried forward into succeeding years.

7. **PROTECTION OF TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION.** The parties agree and acknowledge that by virtue of the Employee's position with the Corporation, the Employee will necessarily have full and complete access to all trade secrets, specialized marketing and distribution practices and techniques, financial information, subscriber information and other information, data and knowledge which may be of a confidential and sensitive nature, all of which the parties further agree are so vital to the continued success of the Corporation as to be protected against being disclosed or divulged by the Employee to persons not in the Corporations' employ, particularly those who compete with the Corporation in publishing and otherwise disseminating information concerning the University of Notre Dame and its athletic programs and for any other product or service marketed or provided by the Corporation.

The Employee then, in addition to any other limitation, regardless of the circumstances of the termination of his employment with the Corporation, specifically agrees that:

A. He will not, whether during the term of his employment or subsequent to the termination of his employment, in any fashion, form or manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation, in any manner whatsoever, any information of any kind, nature of description, concerning any matters affecting or relating to the Corporation's business. Such matters include but are not limited to the names, addresses, telephone numbers or or particular desires or needs of customers or advertisers of the Corporation, the prices charged or costs associated with the Corporation's services or products, or information concerning product or market development and distribution without regard to the probability that any or all of the foregoing matters would not be deemed confidential, material or important enough to warrant protection as a trade secret in the absence of a written agreement designating such information as "Confidential" and expressly restricting the use of such information. Therefore, this Agreement is intended to afford the Corporation with certain protections that it would otherwise not be entitled to and with this purpose in mind, the parties hereto stipulate that, as between them, the same are important, material and confidential, and gravely affect the successful conduct of the Corporation's business and its goodwill, and that any breach of the terms of this subparagraph is a material breach of this Agreement. This subparagraph will not be deemed to prevent the Employee from disclosing such matters if such disclosure is necessary to the Corporation's business and to the performance of the Employee's duties under this Agreement, so long as such disclosure does not involve a trade secret or other theretofore undisclosed matter, and the Employee makes such disclosure

2

under circumstances and in a manner reasonably calculated to benefit the Corporation, as opposed to the employee or actual or potential competitors of the Corporation.

**8. RESTRICTIVE COVENANTS.** The Corporation and employee agree that the Corporation is engaged in publishing a news magazine devoted primarily to covering the University of Notre Dame and its athletic programs and related literature and information (the "Corporation's Business") and information services and has built up and established a valuable and extensive trade in this market. The Employee expressly agrees as further consideration of his continued employment the payment of his wages and the agreement to pay benefits as herein provided, if the Employee's relationship with the Corporation terminates for any reason, then for a period of two (2) years thereafter the Employee shall not and he agrees that he will not, directly or indirectly, do any of the following:

(A) Own an interest in, operate, join, control or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder or principal of or in any corporation, partnership, proprietorship, firm, association or other entity, developing, soliciting orders for, selling, distributing, or otherwise marketing products, goods and/or services which directly or indirectly, compete with the Corporation's Business, including but not limited to the operation of any internet/website service or the employment for any internet/website organization. The Employee acknowledges that in view of the scope of the Corporation's Business, the area in which the Employee shall be precluded from competing is both reasonable and reasonably required for the protection of the Corporation.

(B) Own an interest in, operate, join, control or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder or principal of or in The South Bend Tribune, The Irish Sports Report, Schurz Communications or any entity affiliated with or under common ownership or control of any of the foregoing.

(C) Induce or influence or attempt to induce or influence, any person who is engaged as an employee, agent, broke, independent contractor or otherwise by the Corporation, to terminate his or her engagement or to engage or otherwise participate in a business actively, directly or indirectly, competitive with the Corporation's business.

(D) Either for himself or for any other person, firm or corporation, divert or take away, or attempt to divert or take away, call upon or solicit or attempt to call upon or solicit, any of the customers of advertisers of the Corporation, or potential customers or advertisers of the Corporation, or distributors of the Corporation's products or services, whom he called upon or whom he solicited or with whom he became acquainted while in the employ of the Corporation.

(E) Make any use of the information described in subparagraph 7(A) above or cause or attempt to cause any other person to use such information, for purposes other than the business of the Corporation; or

3

(F) Undertake planning for or organization of any business activity competitive with the Corporation's business, or combine or conspire with other employees of the Corporation for the purpose of organizing any such competitive business activity.

It is further agreed that the restrictive covenants contained in this paragraph 8 shall be limited to the Continental United States. The parties agree and acknowledge that the above restrictive covenants are both reasonable and necessary to protect the interests of the Corporation as to geographical area, scope of restricted activity and duration.

Nothing contained in this paragraph 8 shall be deemed a waiver of the Employee's obligation under paragraph 7 above, and in the event of any conflict or inconsistency between the provisions of this paragraph 8 and paragraph 7 above, the provisions of paragraph 7 above shall control.

9. **BOOKS AND RECORDS.** In the event of termination for any reason, the Employee shall deliver promptly to the Corporation the originals and all copies of any notes, books, correspondence, lists of customers, distributors and advertisers, lists of potential customers, distributors and advertisers and all other records whether written, magnetic or otherwise relating to the Corporation's business which are in the Employee's possession or under his control as of the date of termination.

10. **SEVERABILITY.** The Corporation and Employee agree that the restrictive covenants contained in paragraphs 7, 8 and 9 above are severable and separate, and the unenforceability of any specific covenant herein shall not affect the validity of any other covenant set forth herein. These covenants on the part of employee shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Employee against the Corporation, whether predicated on this Agreement or otherwise, and shall not constitute a defense to the enforcement by the Corporation of said covenants.

If any Court of competent jurisdiction shall determine that the time period or the territory herein restricting competition is unreasonable, said covenants shall not be determined to be null and void and of no effect, but shall be reformed by said Court to impose a reasonable time period or reasonable territorial limitation, as the case may be.

11. **SURVIVAL OF COVENANTS.** This Agreement shall be binding upon and inure to the benefit of any successors or heirs or representatives of the parties hereto. The restrictive covenants and promises of the Employee contained in this Agreement shall survive any termination or recission of this Agreement unless the Corporation executes a written agreement specifically releasing the Employee from such covenants. Provided, however, in the event that the ownership of the Corporation is transferred prior to expiration of the two (2) year restrictive period, Employee shall be released from restriction under paragraph 8/after one (1) year if the Corporation is sold to anyone other than Schurz Communications.

12. **LEGAL AND EQUITABLE RELIEF.** The parties hereby acknowledge and agree that in the event of the breach by Employee of any of the restrictions contained in paragraphs 7,

4

8 or 9 above of this Agreement, the Corporation shall be entitled to injunctive and equitable relief both during dependency of the action and permanently, without the necessity for the posting of bond, or other security, since the remedy at law would be inadequate and insufficient to prevent a breach of this Agreement, or any part of it, and to secure the enforcement of this Agreement. In addition, the Corporation bringing such action shall be entitled to such other remedies in law, in equity, or under this Agreement, as may be available, including, without limitation, reasonable attorney fees and such damages as it can show that it has sustained by reason of such breach.

13. **ENTIRE AGREEMENT.** This Agreement constitutes the entire Agreement between the parties and no other agreements, written or oral exist.

14. **MODIFICATION.** This Agreement may be altered by written agreement only.

15. **INDIANA LAW.** This Agreement shall be interpreted by the laws of the State of Indiana and no provision in this Agreement shall be interpreted for or against any party because that party or its legal representative drafted the provision.

16. **DESCRIPTION HEADINGS.** The descriptive headings used herein are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

**"CORPORATION"**                                    **"EMPLOYEE"**

By: _____        By: _____

Its President

5

## INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT made this 30th day of August, 2004 by and between FAN ACTION, INC., an Indiana corporation (the "Corporation") and TIMOTHY PRISTER (the "Contractor").

### Statement of Facts

The Corporation and Contractor are parties to a certain Employment and Non-Compete Agreement dated as of June 14, 2002 (the "Employment Agreement").

Contractor was employed by the Corporation through September 3, 2003 (the "Resignation Date") on which date Contractor voluntarily resigned his employment and the Corporation has accepted Contractor's resignation.

The Corporation and Contractor have agreed to enter into this Independent Contractor Agreement (the "Restated Agreement").

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1.    The Corporation and Contractor agree that the Employment Agreement has been voluntarily terminated by the Contractor as of the Resignation Date and except as expressly set forth herein, neither the Corporation nor Contractor shall have any further claims against the other pursuant to the Employment Agreement and/or the Contractor's employment thereunder, all of which claims, whether known or unknown, are hereby released by each of Contractor and the Corporation.

2.    Notwithstanding the provisions of Paragraph 1, Contractor acknowledges and agrees that he shall continue to remain bound by all of the post-term covenants set forth in the Employment Agreement, which are amended and restated as follows:

    A.    **PROTECTION OF TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION.** The parties agree and acknowledge that by virtue of the Contractor's position with the Corporation, the Contractor will necessarily have full and complete access to all trade secrets, specialized marketing and distribution practices and techniques, financial information, subscriber information and other information, data and knowledge which may be of a confidential and sensitive nature, all of which the parties further agree are so vital to the continued success of the Corporation as to be protected against being disclosed or divulged by the Contractor to persons not in the Corporation's employ, particularly those who compete with the Corporation in publishing and otherwise disseminating information concerning the University of Notre Dame and its athletic programs and for any other product or service marketed or provided by the Corporation.

The Contractor then, in addition to any other limitation, regardless of the circumstances of the termination of this Restated Agreement, specifically agrees that:

(i).    He will not, whether during the term of this Restated Agreement or subsequent to the termination of this Restated Agreement, in any fashion, form or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, or corporation, in any manner whatsoever, any information of any kind, nature or description, concerning any matters affecting or relating to the Corporation's business.  Such matters include, but are not limited to, the names, addresses, phone numbers or particular desires or needs of customers or advertisers of the Corporation, the prices charged or costs associated with the Corporation's services or products, or information concerning product or market development and distribution without regard to the probability that any or all of the foregoing matters would not be deemed confidential, material, or important enough to warrant protection as a trade secret in the absence of a written agreement designating such information as "confidential" and expressly restricting the use of such information.  Therefore, this Restated Agreement is intended to afford the Corporation with certain protections that it would otherwise not be entitled to and with this purpose in mind, the parties hereto stipulate that, as between them, the same are important, material and confidential, and gravely affect the successful conduct of the Corporation's business and its goodwill, and that any breach of the terms of this subparagraph is a material breach of this Restated Agreement.  This subparagraph will not be deemed to prevent the employee from disclosing such matters if such disclosure is necessary to the Corporation's business and to the performance of the Contractor's duties under this Restated Agreement, so long as such disclosure does not involve a trade secret or other theretofore undisclosed matter, and the Contractor makes such disclosure under circumstances and in a manner reasonably calculated to benefit the Corporation, as opposed to the Contractor or actual or potential competitors of the Corporation.

B.    RESTRICTIVE COVENANTS.  The Corporation and Contractor agree that the Corporation is engaged in publishing a news magazine devoted primarily to covering the University of Notre Dame and its athletic programs and related literature and information (the "Corporation's Business") and information services and has built up and established a valuable and extensive trade in this market.  The Contractor expressly agrees, as further consideration of this Restated Agreement, upon the expiration of this Restated Agreement or the earlier termination for any reason whatsoever, then for a period of fifteen (15) months thereafter the Contractor shall not and he agrees that he will not, directly or indirectly, do any of the following:

2

(i)     Own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of or in any corporation, partnership, proprietorship, firm, association or other entity, developing, soliciting orders for, selling, distributing, or otherwise marketing products, goods and/or services which directly or indirectly, compete with the Corporation's Business.   The Contractor acknowledges that, in view of the scope of the Corporation's Business, the area in which the Contractor shall be precluded from competing is both reasonable and reasonably required for the protection of the Corporation.

(ii)    Own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of or in The South Bend Tribune, The Irish Sports Report, Schurz Communications, or any entity affiliated with or under common ownership or control of any of the foregoing.

(iii)   Induce or influence or attempt to induce or influence, any person who is engaged as an employee, agent, broker, independent contractor, or otherwise by the Corporation, to terminate his or her engagement or to engage or otherwise participate in a business actively, directly, or indirectly, competitive with the Corporation's business;

(iv)    Either for himself or for any other person, firm, or corporation, divert or take away, or attempt to divert or take away, call upon or solicit or attempt to call upon or solicit, any of the customers of advertisers of the Corporation, or potential customers or advertisers of the Corporation or distributors of the Corporation's products or services, whom he called upon or whom he solicited or with whom he became acquainted while in the service of the Corporation as either an employee or independent contractor;

(v)     Make any use of the information described in subparagraph 2(A) above or cause or attempt to cause any other person to use such information, for purposes other than the business of the Corporation; or

(vi)    Undertake planning for, or organization of, any business activity, competitive with the Corporation's business, or combine or conspire with other employees of the Corporation for the purpose of organizing any such competitive business activity.

It is further agreed that the restrictive covenants contained in this paragraph 2 shall be limited to the Continental United States. The parties agree and acknowledge that the above restrictive covenants are both reasonable and necessary to protect the

3

interest of the Corporation as to geographical area, scope of restricted activity and duration.

C. **BOOKS AND RECORDS.** In the event of termination of this Restated Agreement for any reason, the Contractor shall deliver promptly to the Corporation the originals and all copies of any notes, books, correspondence, lists of customers, distributors and advertisers, lists of potential customers, distributors, and advertisers and all other records whether written, magnetic or otherwise relating to the Corporation's business which are in the Contractor's possession or under his control as of the date of termination.

D. **SEVERABILITY.** The Corporation and Contractor agree that the restrictive covenants contained in this paragraph 2 are severable and separate, and the unenforceability of any specific covenant herein shall not affect the validity of any other covenant set forth herein. These covenants on the part of Contractor shall be construed as an agreement independent of any other provision in this Restated Agreement, and the existence of any claim or cause of action of Contractor against the Corporation whether predicated on this Restated Agreement or otherwise and shall not constitute a defense to the enforcement by the Corporation of said covenants.

If any court of competent jurisdiction shall determine that the time period or the territory herein restricting competition is unreasonable, said covenants shall not be determined to be null and void and of no effect, but shall be reformed by said court to impose a reasonable time period or reasonable territorial limitation, as the case may be.

E. **SURVIVAL OF COVENANTS.** This Restated Agreement shall be binding upon and inure to the benefit of any assignees of the Corporation's interests herein and any successors, heirs or representatives of the parties hereto. The restrictive covenants and promises of the Contractor contained in this Restated Agreement shall survive any termination or recision of this Restated Agreement unless the Corporation executes a written agreement specifically releasing the Contractor from such covenants.

F. **LEGAL AND EQUITABLE RELIEF.** The parties hereby acknowledge and agree that in the event of the breach by Contractor of any of the restrictions contained in paragraphs 7, 8, or 9 of this Restated Agreement, the Corporation shall be entitled to injunctive and equitable relief both during dependency of the action and permanently, without the necessity for the posting of bond, or other security, since the remedy at law would be inadequate and insufficient to prevent a breach of this Restated Agreement, of any part of it, and to secure the enforcement of this Restated Agreement. In addition, the Corporation bringing such action shall be entitled to such other remedies in law, in equity, or under this Restated Agreement, as may be available, including, without limitation, reasonable

4

attorneys fees and such damages as it can show that it has sustained by reason of such breach.

3.     Contractor will provide the following services to the Corporation and Corporation will pay the Contractor for such services as set forth below:

| Services | Payment |
|---|---|
| A. Contractor will provide four stories per issue consistent in character and content with the stories which Contractor provided during his employment e.g., Extra Point, Opening Whistle, one game story and one additional story written during the week each as mutually agreed between Contractor and the Corporation. | A. $2,000 per issue. |
| B. Contractor will provide two stories per day for the Corporation's web site in character and content consistent with stories that Contractor provided to the Corporation's web site during his employment.<br><br>Contractor will provide daily reports on the Corporation's 900 number in character and content consistent with the 900 number reports he provided during his employment with Corporation. | B. $575.00 per week. |
| C. Contractor will provide reasonable consulting services and editorial support to Lou Somogyi and Pete Sampson as requested from time to time. | C. Included in A and B above. |

4.     The Corporation shall reimburse Contractor for Contractor's reasonable travel and lodging expenses to away Notre Dame football games in a manner consistent with the Corporation's practices during Contractor's employment.

5.     This Restated Agreement shall remain in effect through March 31, 2005 unless the parties elect to extend the term hereof by a written agreement duly executed by both parties. In such event, any services to be provided by Contractor and the associated fees to be paid therefore shall be set forth in such written agreement.

5

6.      This Restated Agreement constitutes the entire agreement between the parties and no other agreements, written or oral exist.

7.      This Restated Agreement may be altered by written agreement only.

8.      This Restated Agreement shall be interpreted by the laws of the State of Indiana and no provisions of this Restated Agreement shall be interpreted for or against any party because that party or its legal representative drafted the provision.

Dated as of the date and year first above written.

"Corporation"

Fan Action, Inc.

By: Robert J. Firth
Its: President

"Contractor"

Timothy Prister

6

Shannon Terry Is Pissed Off, Threatens Lawsuit Against TechCrunch
by Michael Arrington on April 13, 2007

I just received the letter below by email, in reference to my previous post on Shannon Terry and Rivals.com. I'm not going to make a statement on this just yet - our lawyers are involved and have advised me to keep quiet for now.

I'll say this much, though. Rivals is no longer my favorite sports news site.

*Update (11:42 pm PST 4/13/08): I am still not prepared to respond directly to the letter below. However, I do want to reach out directly to Shannon Terry and say this: I offer you the opportunity to to respond in writing to my initial post and refute any fact or opinion that is stated in that post. I will publish your unedited response here on TechCrunch, giving it full and equal publicity to the original post. In fact, I'll leave it up on the top of page one for a full 24 hours, and you can choose the day you would like it published. It will remain permanently on TechCrunch and will have a distinct URL. It can be any length you feel is appropriate, and you can link to whatever supporting documents you like.*

## Bob Firth

**From:** edgarrity [edgarrity@sbcglobal.net]
**Sent:** Thursday, July 07, 2005 9:46 AM
**To:** Bobby Firth
**Subject:** Fw: Welcome

*2 months astw the quit*

----- Original Message -----
**From:** Jack @ Rivals
**To:** edgarrity@sbcglobal.net
**Sent:** Thursday, July 07, 2005 8:00 AM
**Subject:** Welcome

Welcome To BlueandGold.com
I wanted to send you a quick note from the staff of BlueandGold.com thanking you for your subscription to our site. We look forward to providing you the best coverage of Notre Dame sports on the Internet. By signing up you are joining one of the top communities of Notre Dame fans on the web. Below are some key links to help you get started with our service. Again, we appreciate your business and if you have any questions or comments about the site, feel free to send an e-mail me at: nd-rivals@ameritech.net.

### Getting Started

The first place you must visit is our premium message board entitled The Four Horsemen Lounge. This board is only for Notre Dame fans that have subscribed to BlueandGold.com. Fans from other schools are not allowed. The Lounge is the place for ND fans to exchange information, express their views and cheer on the Irish. But the Lounge isn't only for fans, the expert staff of BlueandGold.com can be found on the board as well, answering your questions and providing you with the inside scoop on Notre Dame sports and recruiting.
Click on the link below to visit the Lounge and make sure to bookmark it once you're there.
http://bgi.rivals.com/forum.asp?fid=1418

### The Ticker

This link keeps you in the know with recruiting. On a 24/7/365 schedule, the Ticker lists every recruiting update on the Rivals.com network about players considering Notre Dame among their top schools. When recruiting season really heats up in the fall, you can expect to find an additional 10 recruiting updates here on a daily basis on top of what you're already getting from the BlueandGold.com staff!
http://bgi.rivals.com/recruitingindex.asp

### The Recruiting Database

This is your link to the Internet's most comprehensive database on football recruiting. Here you can create your own recruiting hot list, search for the players that will impact Notre Dame's football future and watch highlight videos of tomorrow's stars. Want to check out video clips of future Irish tailback James Aldridge or top quarterback prospect Zach Frazer? You can do it here.
http://bgi.rivals.com/prosearch.asp
**Other Important Links**

**Your User Options Page**

This is where you can set up your signature and make Blueandgold.com your home site.

http://bgi.rivals.com/useropts.asp?MBO=1

11/16/2009



**INBOX: dave.follett**

Storage 1% used

**From:** Jack <jfreeman@ameritech.net> [Add to Address Book] [View Source]
**To:** Dave Follett <dave.follett@comcast.net>
**Subject:** Just a thought
**Date:** Mon, 15 Aug 2005 03:23:25 +0000

Dave,

First of all I don't want this to interfere with our friendship which I value. These are shitty times but at least we are in the end stages of this ugly divorce.

Here is my proposal:
Launch the new site ASAP. Move on and get the next era of BGI started. Don't drag it out till Friday. I'm very sure that Rivals will pay you what you have coming to you as if you'd stayed until Friday. I would be very happy to broker such a deal.

Think there is a chance?

For the record: I HATE THIS SHIT

Jack

© 2005 Comcast Cable Communications, Inc. All rights reserved.
Privacy Statement  Terms of Service  Contact Comcast



8/15/2005 11:35 AM

**Bob Firth**

From:       Tim Prister [tjprister@yahoo.com]
Sent:       Tuesday, August 23, 2005 10:23 AM
To:         bfirth@blueandgold.com
Subject:    BGI

Bob,

It would appear that BGI is moving on without me and I understand your feelings regarding
that decision. I would, however, like to try one more time to make the effort to continue
writing for your newspaper.

Philosophically, we just don't agree on the approach on the Blue & Gold website. I'm not
saying you're wrong, I'm just saying I have a different idea as to what the future holds
on the web. We can agree to disagree.

I share the same vision, however, of the newspaper.
I've never wanted to stop writing for the newspaper. I understand the value that you place
on me appearing on the website, but isn't there some way we can work out a deal where I
continue writing for the paper? The newspaper is still the foundation of everything that
you do. Despite the shift among consumers to website viewing, I still believe the
newspaper will always be the foundation of Blue & Gold.

This may sound crazy, but even after I begin writing for the Rivals website, I would still
like to write for the Blue & Gold newspaper. I believe they would consent to that if you
were agreeable to that.

We still have about two weeks before the start of the season. My columns – Extra Point and
Timeout – have been the focal points of Blue & Gold for the past 23 years. Can't we work
something out where I still write for the newspaper? Think about it, pray upon it, and
then let's talk.

I believe your subscribers still want to read what I think about Notre Dame football, and
I still very much want to be a part, albeit a smaller part, of the Blue & Gold family. I
can cut the cost down to make it more manageable. Let's talk in a couple of days and see
if we can't come up with a compromise.

Bob, I believe this can still be a win-win situation for both of us. I certainly
understand your feelings toward Rivals and the anger you must feel toward me for making
the decision I did. But as I said, I still think we can agree to disagree on some issues
but still maintain a working relationship.

Tim

_____

Start your day with Yahoo! – make it your home page http://www.yahoo.com/r/hs

Make Copy

1

5-9-03

Bob,

Rivals approached me to write four stories a week for espn.com, as well as a taking part in a pay chat room that is entitled "The Leprechaun Lounge" in which I interact with subscribers to the cite.

This additional work would entail approximately 200 additional stories per year for espn.com, once-a-week visits to the "Lounge" to answer questions and any additional recruiting information that I could provide.

Bobby Burton indicated through Jack that they could pay me $500 a month for this service. I was told that the money would not be taken out of Blue & Gold Illustrated's cut for the other work I do for them. The $500 would come out of the money Rivals made from my additional endeavor.

I've now been told that the $500 that was paid to me in May was taken out of the profits owed to Blue & Gold Illustrated. This is contrary to my understanding of the agreement.

While I will admit in hindsight that it would have been better to approach you on this topic before agreeing to it, I also viewed it as work above and beyond my responsibilities with Blue & Gold Illustrated with regard to Rivals. My responsibilities to that website were never compromised as a result of this agreement.

I have not received a pay increase from Blue & Gold Illustrated for approximately four years as a result of the company's financial situation, although my responsibilities toward BGI's and Rivals' websites have accounted for an increase of stories written to approximately 750 per year.

I was simply trying to supplement my income through freelance work while not compromising my commitment to the company. Had I intended to deceive Blue & Gold Illustrated, I certainly would have gone to great lengths to make sure that my name did not appear on the statements sent from Rivals to BGI.

I hope you understand my perspective on this situation.

Sincerely,

Tim Prister
Editor